**Affirmed and Opinion filed May 17, 2012.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

_____

## NO. 14-10-01039-CV
_____

**FARDAD ADULI, Appellant**

**V.**

**VALERIE ADULI, Appellee**

---

**On Appeal from the 308th District Court
Harris County, Texas
Trial Court Cause No. 2008-60128**

---

## OPINION

In this divorce appeal, Fardad Aduli argues that the trial court erred in denying his special appearance and abused its discretion in permitting his counsel to withdraw on the day of trial; denying his motions for a continuance and a new trial on the basis that he had been forced to leave the country; and adopting his wife's proposed division of the marital estate without sufficient evidence. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Fardad and Valerie Aduli married in Louisiana in 2003. Fardad, an Iranian citizen,

was in the United States on an H-1 work visa. Valerie, a citizen of France, was in the country on an H-4 visa as Fardad's spouse.[1] For about five years, the Adulis lived in a suburb of New Orleans while Fardad worked for his brother, who had sponsored Fardad's visa. In 2006, Fardad and Valerie visited Houston. The Adulis took a liking to the city, and Fardad spoke of moving there to find work at the Texas Medical Center after he got his green card. In early 2008, Fardad bought and furnished a condominium in Houston, and Valerie moved there in January of that year.

According to Valerie, Fardad planned to join her in Houston after he got his green card. According to Fardad, however, Valerie moved to Houston because the Adulis had decided to separate. In his telling, Fardad purchased the condo in Houston because Valerie wanted to live there and Fardad "wanted [Valerie] to be comfortable" during their separation, but Fardad never intended to move to Houston himself. For the next several months, Fardad paid Valerie's utility bills, made mortgage payments on the condo, and paid condominium association fees. He also gave Valerie $1,000 each month for living expenses. According to Fardad, he visited Valerie "maybe once every month and a half, once a month" for "[t]wo days, three days max" during their separation. According to Valerie, Fardad visited two or three times a month, for four days at a time. When Fardad visited, the Adulis shared a bed but were never intimate; Valerie had long suspected Fardad of engaging in an extramarital affair—a suspicion Fardad confirmed about a month before Valerie filed for divorce—and, as she stated, did not want to risk becoming pregnant by a man she did not trust.

In October 2008, Valerie filed for divorce in the trial court, citing irreconcilable differences, cruel treatment and adultery. Fardad filed a special appearance on the basis that Texas was not the Adulis' last marital residence and there was no other valid basis for asserting personal jurisdiction over Fardad. After a hearing, the trial court denied Fardad's special appearance. Shortly thereafter, Fardad and Valerie agreed to a set of

---

[1] The record does not indicate Valerie's immigration status before the Adulis' marriage.

temporary orders and injunctions relating to spousal support, payment of debts, temporary use of property, and discovery.   Under the discovery provisions, each party had to provide a sworn inventory and appraisement of all separate and community property, and Fardad was required to provide tax returns for the first five years of the Adulis' marriage.   Fardad was also ordered to pay Valerie's attorneys' and experts' fees.   In addition, both parties were bound by a restraining order from "making any withdrawals from any checking, savings, or brokerage account in any financial institution, for any purpose," except as authorized by the trial court.

Over the next year, Fardad repeatedly violated the trial court's restraining order by withdrawing money from his accounts.   He also failed to comply with the trial court's discovery orders and failed to pay Valerie's attorneys' and experts' fees.   On three separate occasions in late 2009, the trial court warned Fardad that failure to comply with the trial court's orders would result in Fardad's pleadings being struck.   After Fardad continued to disregard the trial court's orders, the trial court struck Fardad's pleadings as a sanction and ordered that he would not be allowed to offer "any controverting testimony to testimony and or evidence presented by [Valerie] . . . except through cross examination."

In February 2009, Fardad filed a motion to dismiss, representing to the trial court that his application for a permanent work visa had been denied and that both he and Valerie were required to leave the country.   He attached two letters from the United States Citizenship and Immigration Services ("USCIS"), dated in September 2008, informing Fardad and Valerie of this decision separately.   The trial court denied Fardad's motion to dismiss.   Although Fardad had declared his intent to comply with the USCIS order immediately, a year later he filed a Suggestion of Bankruptcy based on a Chapter 7 bankruptcy proceeding he had initiated in Louisiana that month, and requested a stay of the divorce proceedings.   No order relating to this request appears in the record.

On July 23, 2010, nine days before trial, Fardad's counsel, Todd Frankfort, filed a motion to withdraw, citing his inability to "effectively communicate with Fardad . . . in a

3

manner consistent with good attorney-client relations." A hearing was set before trial on August 2, 2010. On July 30, Fardad (though Frankfort) requested a continuance, citing his absence from the country and attaching a second letter from the USCIS. This letter, dated May 27, 2010, informed Fardad that his February 2010 "Application to Extend/Change Nonimmigrant Status" had been denied and that "[t]his decision [left Fardad] without lawful immigration status; therefore, [he was] present in the United States in [v]iolation of the law." In requesting a continuance, Fardad claimed that he had been forced to return to Paris and needed time to obtain a new visa. When Frankfort's motion to withdraw came up for hearing before trial, the trial court considered Fardad's request for continuance as well.

At the hearing, the following exchange took place:

MR. FRANKFORT: Judge, I've had various issues with Mr. Aduli. I guess, the most significant of which is that a good portion of my fees were discharged in bankruptcy and now he is left owing us some money and I just am not comfortable being in that position. He has sent me a letter opposing my withdrawal that he would like read into the record. May I proceed with that at this time?
. . . .

THE COURT: Yes. Is it an e-mail?

MR. FRANKFORT: It was sent by e-mail. I received the following e-mail from Mr. Aduli on July 30 at 12:27 p.m. It says, ". . . Your Honor, I cannot be present at my trial because my application for an extension of visa was denied and I had to leave the United States. I am writing this letter to oppose my attorney[']s Motion to Withdraw for the following reasons:

Number one, as you know, Your Honor, I have been declared bankrupt under Chapter 7 and do not have any assets to pay Mr. Frankfort at this time. I have no assets and have been declared bankrupt. I do not have any income as I do not have a job.

Number two, Mr. Frankfort informed me of his intention to withdraw as my attorney merely eight days ago and that has not left me with ample time to find another counsel.

4

Number three, Mr. Frankfort has been my counsel for almost one year and is fully aware of the facts of my case. Any other counsel being limited in time would not have been able to represent my best interest as he or she would not have had ample time to study my case.

THE COURT: A response to that.

MR. FRANKFORT: Judge, when I became aware of—I knew that a portion of my fees had been discharged in bankruptcy. I knew that the likelihood of me getting paid on the remainder of the case was slim. As I delved further into the case, I felt less comfortable representing Mr. Aduli. And I just felt like I needed to—I needed to get out. I was unable to—I had planned on speaking with other attorneys in my office concerning the withdrawal, and did not have an opportunity to do so prior to eight days prior to the time we sent the motion to Mr. Aduli for his review. And based on those facts, I would ask this Court's permission to withdraw from the case.

The trial court granted Frankfort's motion to withdraw and denied Fardad's request for a continuance.

In her proposed property division, Valerie requested the condominium, valued at $66,367.00; Fardad's 2002 Mercedes, valued at $22,713.00; $635,457 in reimbursement for waste of community assets; a bank account in her own name containing $170; and all of the furniture, fixtures, electronics and computers in her possession. In total, Valerie asked for 58% of the community assets, with a value of $726,207.00. She also submitted a financial information sheet and a sworn trial inventory and appraisement. Valerie conceded to Fardad his watch collection; a condominium he owned in Iran; a second car Fardad had purchased; certain life insurance policies and annuities of undetermined value; company retirement benefits; and other miscellaneous assets. When Valerie began her testimony on the contents of the inventory, the trial court asked whether she was requesting that the trial court "take judicial notice of [the inventory] for evidentiary purposes" and further inquired whether she was "offering it as a shorthand rendition of her testimony." Valerie's attorney answered affirmatively to both questions. After hearing Valerie's

5

testimony, the trial court rendered a default judgment against Fardad and granted all of Valerie's requested relief.

Fardad timely filed a motion to set aside the default judgment and for a new trial. In his motion, Fardad represented that his failure to appear at trial had been "the result of accident and mistake, rather than . . . intentional or conscious indifference," that he had a "meritorious defense" to Valerie's claims, and that a new trial would neither occasion undue delay nor prejudice Valerie. To this Fardad attached an affidavit, dated September 13, 2010 and notarized by the Vice Consul of the U.S. Embassy in Paris, in which Fardad attested that he had been forced to leave the United States and return to Paris because his application for a permanent visa had been denied. He also included a copy of the May 27, 2010 USCIS letter identical to that which he had included in his request for a continuance and a photocopy of a U.S. Airways boarding pass for a flight from Charlotte to Paris dated June 30 of an unspecified year. The trial court denied Fardad's motion and Fardad filed his notice of appeal the same day.

## II. ISSUES PRESENTED

On appeal, Fardad argues that the trial court erred in denying his special appearance. He also contends that the trial court abused its discretion in permitting Frankfort to withdraw, denying Fardad's motions for a continuance and a new trial, and adopting Valerie's proposed division of the marital estate without sufficient evidence.

## III. ANALYSIS

### A.    Special Appearance

Fardad first argues that the trial court erred in denying his special appearance. Before reaching the merits of this issue, we address Valerie's argument that Fardad waived error by entering into a set of Agreed Temporary Orders and Injunctions after his special appearance was denied. The Agreed Temporary Orders open with the following statement: "The Court, having considered the pleadings, evidence, and argument of counsel, finds . . . that this Court has jurisdiction over the parties and subject matter of this cause." According to Valerie, this means that the parties agreed to waive any claimed

6

jurisdictional defects. It is not until after this preliminary statement, however, that the preface "It is agreed and ordered . . ." appears, followed by a number of orders relating to spousal support, payment of debts, temporary use of property, and discovery. Thus, it appears that the jurisdictional statement is not itself one of the agreed orders. Further, because the trial judge had already ruled on the special appearance, this was a true finding of the court and not an agreement by counsel. We decline to hold that Fardad waived complaint about this issue. *See* TEX. R. CIV. P. 120a(4) (if objection to jurisdiction is overruled, the objecting party may thereafter appear generally for any purpose, and any such appearance shall not be deemed a waiver of the objection to jurisdiction); *see also Antonio v. Marino*, 910 S.W.2d 624, 628 (Tex. App.—Houston [14th Dist.] 1995, no writ) (filing stipulation, even without expressly making it subject to special appearance, did not waive objection to personal jurisdiction).

Whether a court has personal jurisdiction over a defendant is a question of law that we review de novo. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871 (Tex. 2010) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)). However, the trial court frequently must resolve questions of fact before deciding the jurisdictional question. *BMC Software*, 83 S.W.3d at 794. When, as here, a trial court does not issue findings of fact or conclusions of law to support its special appearance determination, we presume that all factual disputes were resolved in favor of the trial court's ruling. *Spir Star*, 310 S.W.3d at 871. However, when the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the courts of appeals. *BMC Software*, 83 S.W.3d at 795 (citing *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989) and *Zac Smith & Co. v. Otis Elevator Co.*, 734 S.W.2d 662, 666 (Tex. 1987)); *see id.* at 794 (noting that the courts of appeals, unlike the Texas Supreme Court, have jurisdiction to review the trial court's fact findings for both legal sufficiency and factual sufficiency). We determine the appropriateness of the district court's resolution of those disputes by an ordinary sufficiency of the evidence review based on the entire record. *Conner v. ContiCarriers &*

7

*Terminals, Inc*., 944 S.W.2d 405, 411 (Tex. App.—Houston [14th Dist.] 1997, no writ). For legal sufficiency points, if there is more than a scintilla of evidence to support the finding, the evidentiary challenge fails. *BMC Software*, 83 S.W.3d at 795 (citing *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)). For factual sufficiency points, we consider all of the evidence and set aside the order "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). If evidence supports the implied findings of fact, we must uphold the trial court's judgment on any legal theory supported by the findings. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). A defendant who challenges the trial court's exercise of personal jurisdiction through a special appearance carries the burden of negating all bases of personal jurisdiction. *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex. 1985).

Texas courts may exercise jurisdiction over a nonresident defendant if the Texas long-arm statute authorizes the exercise of jurisdiction and the exercise of jurisdiction is consistent with federal and state due process guarantees. *Max Protetch, Inc. v. Herrin*, 340 S.W.3d 878, 884 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007)). In a suit for dissolution of a marriage, a court of this state may acquire jurisdiction over a nonresident spouse if Texas was the parties' last marital residence or if there is any basis consistent with the state and federal constitutions for exercise of personal jurisdiction. TEX. FAM. CODE ANN. § 6.305(a) (West Supp. 2011). Fardad argues that the trial court erred in denying his special appearance because the evidence is factually and legally insufficient to support a determination that the Adulis' last marital residence was in Texas and because the trial court's exercise of jurisdiction is inconsistent with federal due process.[2]

**i.      Last Marital Residence**

_____

[2] Fardad raises no state due process argument.

Fardad first argues that Houston was not the Adulis' "last marital residence" because he never intended to live there and he and Valerie had separated when she moved to Houston. The Family Code does not define "last marital residence," and few courts have interpreted that term. However, the Austin Court of Appeals examined the term in a context similar in some ways to the case at bar. *See Goodenbour v. Goodenbour*, 64 S.W.3d 69, 69 (Tex. App.—Austin 2001, pet. denied). In *Goodenbour*, the husband, Jay Goodenbour, moved to New Zealand to start a new job while his wife, Kathryn, remained in Washington State with their children. *Id.* at 74. Kathryn and the children planned to move to New Zealand later, but Kathryn developed reservations and accepted a job in Texas. *Id.* Jay helped Kathryn find a house in Texas, provided financial information in connection with the mortgage, and gave Kathryn power of attorney so that she could close the sale in his name. *Id.* Both spouses held title to the property. *Id.* Jay visited Kathryn and the children at least five times over the next two years for a total of about forty days, still hoping to "keep his marriage alive." *Id.* When Kathryn filed for divorce, Jay successfully filed a special appearance, and Kathryn appealed. *Id.* The court of appeals reversed, holding that the Texas home was the couple's "last marital residence." *Id.* at 78. The court observed that

> [i]n applying the term "last marital residence," we should acknowledge that more and more frequently one spouse may, by choice or necessity, work in a state or country apart from the family unit for a period of time. A work separation, where spouses live apart to pursue professional opportunities, must be distinguished from a marital separation when spouses have decided to dissolve their marriage. . . . As long as the parties choose to maintain a marriage, there will be a marital residence somewhere.

*Id.* at 76. The court noted that Jay had evinced intent to maintain the marriage while his wife and children were in Texas. *Id.* at 77. He visited for family events, and "[d]uring these trips, the parties lived together as man and wife." *Id.* The court also noted that Jay kept his personal belongings at the house in Texas and had played a major role in purchasing the home. *Id.* Concluding that "[t]his family bore all the characteristics of a functioning family unit living in Austin, even though one of the spouses

9

worked in New Zealand . . ." the court held that Austin was the couple's last marital residence. *Id.* at 77–78.

Under the analysis set forth in *Goodenbour*, the evidence in this case is sufficient to show that Houston was the Adulis' last marital residence. We find three points particularly revealing: first, Fardad purchased the condo in Houston in his own name. He paid the utility bills and association fees, made mortgage payments, and gave Valerie a monthly stipend while she lived there. Second, Fardad visited Valerie frequently—even though the Adulis, unlike the Goodenbours, had no children. As Valerie stated, Fardad visited her because "[h]e is my husband." Third, according to Valerie, the couple had not separated and had no intention of doing so when she moved to Houston, notwithstanding Fardad's testimony to the contrary. These facts, taken together, are sufficient to show that Houston was the Adulis' last marital residence.

Fardad is correct to point out certain differences between this case and *Goodenbour*. Unlike Jay Goodenbour, Fardad did not move most of his possessions to his wife's new home, and unlike the Goodenbours, who "lived as man and wife" in Austin, Valerie and Fardad were never intimate in Houston. But not every possible indicator of a marital relationship must be present to support a factually and legally sufficient finding that Valerie and Fardad maintained their last marital residence in Houston. Because more than a scintilla of evidence supports that determination, and the trial court's ruling was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, we hold that the evidence is both legally and factually sufficient to support a finding that the Adulis maintained their last marital residence in Texas. We next turn to whether the assertion of jurisdiction was consistent with federal due process guarantees.

## ii. Minimum Contacts

Federal due process protects a person's liberty interest from being subject to binding judgments in a forum with which he has established no meaningful contacts, ties, or relations. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S. Ct. 2174, 2181,

85 L. Ed. 2d 528 (1985) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S. Ct. 154, 160, 90 L. Ed. 95 (1945)). Under the federal constitutional test of due process, a state may assert personal jurisdiction over a nonresident defendant only if the defendant has purposefully established minimum contacts with the forum state, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id*., 41 U.S. at 476, 105 S. Ct. at 2184.

In determining whether there were minimum contacts between the defendant and the forum state, we focus on whether "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Id*., 41 U.S. at 474, 105 S. Ct at 2183. This requirement ensures that a nonresident defendant will not be called into this jurisdiction based solely on random or fortuitous contacts or the unilateral activity of another party. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C*., 815 S.W.2d 223, 226 (Tex. 1991). A single act can support jurisdiction as long as there is a substantial connection with the forum state. *Phillips v. Phillips*, 826 S.W.2d 746, 748 (Tex. App.—Houston [14th Dist.] 1992, no writ). However, a single act or occasional acts may be insufficient to establish jurisdiction if the nature, quality, and circumstances surrounding their commission only create an attenuated connection with the state, diminishing reasonable forseeability of litigation in the forum state. *Id.*

Fardad purchased, furnished, and made mortgage and utility payments on the condo in Houston; visited Houston several times a month for a few days at a time; and sent Valerie $1,000 per month as a stipend. These actions were not "random and fortuitous contacts" or the result of some unilateral activity on the part of Valerie. Rather, they were purposeful and regular contacts initiated by Fardad, and they were of sufficient quality and quantity that Fardad should not have been surprised to have been called into Texas court for divorce and property division proceedings. *See Reynolds v. Reynolds*, 2 S.W.3d 429, 430 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (so holding where husband left Texas

11

after separation but continued to mail wife money for mortgage, home insurance, and car insurance payments).

Fardad cites *Dawson-Austin v. Austin*, 968 S.W.2d 319, 326 (Tex. 1998), to support his contention that he lacked minimum contacts with Texas. In *Dawson-Austin*, a couple's principal place of residence was in Minnesota and they owned a home in California. *Id.* at 320–21. They had been to Texas only once, years before, to attend a business convention. *Id.* at 326. After the couple separated, the husband moved to Texas and filed for a divorce there. *Id.* at 321. The wife filed a special appearance, which the trial court denied. *Id.* The Texas Supreme Court reversed, holding that the wife lacked "purposeful, minimum contacts" with Texas. *Id.* at 326.

*Dawson-Austin* is distinguishable from this case. In *Dawson-Austin*, the wife never purchased or helped her husband find property in Texas. She also never visited her husband there. The only circumstance connecting either spouse with Texas was the husband's unilateral action of moving to Texas and buying property there. In this case, Fardad himself bought and furnished the condominium in Texas. He also visited Valerie there on several occasions. *Cf. Goodenbour*, 64 S.W.3d at 79 (distinguishing *Dawson-Austin* based on similar factors). We hold that Fardad had sufficient minimum contacts with Texas to support the trial court's jurisdiction.

### iii.    Fair Play and Substantial Justice

Finally, we must determine whether the assertion of jurisdiction comported with the due process requirement of fair play and substantial justice. In undertaking this inquiry, we may evaluate the following factors: (1) the burden on Fardad; (2) Texas's interest in adjudicating the dispute; (3) Valerie's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *See Guardian Royal*, 815 S.W.2d at 231; *Phillips*, 826 S.W.2d at 748. Only in rare cases will the exercise of jurisdiction not comport with fair play and

substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Guardian Royal*, 815 S.W.2d at 231.

At the hearing on his special appearance, there was no evidence, and Fardad did not represent at that time, that he could not be in the country during the suit's pendency. Fardad had travelled to Houston many times to see Valerie and presented no evidence that it would have been an excessive burden for him to continue to travel there as necessary for the divorce proceedings. *See Goodenbour*, 64 S.W.3d at 80 (husband's previous visits to Austin while living in New Zealand showed that it would not be an excessive burden to travel there for divorce proceedings). Distance alone is ordinarily insufficient to defeat jurisdiction. *Guardian Royal*, 815 S.W.2d at 281; *see Goodenbour*, 64 S.W.3d at 80 (holding that the burden on husband living in New Zealand and having to attend divorce proceedings in Texas was not great enough to defeat personal jurisdiction).

With respect to Texas's interest in adjudicating this dispute, aside from a state's routine interest in adjudicating the marital status of its residents, Valerie requested the Houston condo as part of her proposed property division. Texas has a strong interest in adjudicating disputes involving the disposition of real property located in the state. *Goodenbour*, 64 S.W.3d at 80. Also, in granting a protective order, the trial court found that there was a clear and present danger of family violence; in the affidavit supporting her request for this order, Valerie stated that she was afraid that Fardad would physically harm her. Valerie is a Texas resident, and Texas certainly has an interest in protecting its residents from the physical harm that could ensue from escaping the state's jurisdiction, as well as an interest in enforcing its courts' protective orders.

Valerie, too, has a strong interest in obtaining convenient and effective relief in Texas. Valerie lives in Houston and knows no one in Louisiana other than Fardad's family. Given the trial court's finding of a "clear and present danger of family violence" in this case and Valerie's lack of resources and earning potential relative to Fardad—who, prior to his bankruptcy, had made around $160,000 a year—Valerie's interest in obtaining

13

convenient and effective relief in Texas was especially vital. In light of these circumstances, we conclude that the trial court's assertion of personal jurisdiction over Fardad did not violate the requirement of fair play and substantial justice.

Because the evidence is factually and legally sufficient to show that the Adulis' last marital residence was in Texas and the trial court's assertion of personal jurisdiction over Fardad did not violate federal due process, we conclude that the trial court correctly denied Fardad's special appearance. Accordingly, we overrule Fardad's first issue.

## B. Withdrawal of Counsel

In his second issue, Fardad argues that the trial court erred in permitting Frankfort to withdraw on the day of trial. An attorney may withdraw from representing a party only upon written motion for good cause shown. TEX. R. CIV. P. 10. Fardad does not dispute that Frankfort had good cause—failure to receive payment—to withdraw from representing him. However, he argues that Frankfort should have withdrawn sooner so as to minimize the harm to Fardad. *See Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986) (when counsel, without fault or negligence of client, moves to withdraw shortly before trial, a trial court should either deny the motion to withdraw or grant a continuance). Fardad's counsel filed the motion to withdraw on July 23, nine days before trial. Fardad acknowledged receiving the motion eight days before trial. In his sworn motion for continuance, prepared by counsel and filed July 30, Fardad never represented to the trial court that he needed more time to obtain new counsel. In his email opposing the motion to withdraw, Fardad simply asked the court to deny Frankfort's motion without asking for time to obtain new counsel, and in no other filing did Fardad request a continuance on that basis. Because Fardad did not request time to obtain new counsel, he failed to preserve error on this point. *Cf. Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc.*, 937 S.W.2d 60, 70 (Tex. App.—Houston [14th Dist.] 1996), *aff'd as modified*, 975 S.W.2d 546 (Tex. 1998) (an objection at trial that is not the same as the objection urged on appeal presents nothing for appellate review). Accordingly, we overrule Fardad's

second issue.

## C.    Denial of Motion for Continuance

Fardad next contends that the trial court erred in denying his motion for a continuance.    We review the denial of a motion for continuance for an abuse of discretion. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004).    In his request for a continuance, Fardad represented that he was absent from the country, but gave no indication of when or if he would be able to return.    He asked for time to obtain a visa but presented no evidence that he had applied for one.    Fardad did not ask to appear at trial by video-conference or telephone.[3]    Indeed, the trial court had reason to doubt whether Fardad was truly absent from the country: in February 2009, Fardad had represented that he had to leave the country immediately, but a year later he had filed for bankruptcy in Louisiana.    *See Waste Water, Inc. v. Alpha Fishing & Developing Corp.*, 874 S.W.2d 940, 942 (Tex. App.—Houston [14th Dist.] 1994, no pet.) (trial court is permitted to consider the entire history of the case in deciding whether or not good cause exists for granting a continuance).    Against this backdrop, the trial court had to consider the fact that Valerie was not receiving spousal support payments and Fardad had declared bankruptcy.    Taking these facts into account, the trial court did not abuse its discretion in denying Fardad's motion for a continuance.    We overrule Fardad's third issue.

## D.    Denial of Motion for New Trial

Next, Fardad argues the trial court erred in denying his motion for a new trial

---

[3]    In light of his alleged inability to come into the United States, Fardad could have asked to appear via video conference or telephone.    *Cf. Johnson v. Handley*, 299 S.W.3d 925, 929 (Tex. App.—Dallas 2009, no pet.) ("When [an inmate's] request to appear by a specifically described effective means is made, a trial court's denial of the inmate's motion to appear by alternative means is an abuse of discretion unless the court allows the inmate to proceed by some other effective means.")

because he established each of the elements required to obtain a new trial under the equitable principles of *Craddock*. *See Craddock v. Sunshine Bus Lines, Inc.*. 134 Tex. 388, 133 S.W.2d 124 (1939). We review a trial court's refusal to grant a new trial for an abuse of discretion. *Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009) (citing *Cliff v. Huggins*, 724 S.W.2d 778, 778 (Tex. 1987)). Under *Craddock*, a default judgment should be set aside when the defendant establishes that the failure to appear was not intentional or the result of conscious indifference, but the result of an accident or mistake; (2) the motion for new trial sets up a meritorious defense; and (3) granting the motion will occasion no undue delay or otherwise injure the plaintiff. *See Craddock,* 134 Tex. at 390, 133 S.W.2d at 126. In a post-answer default judgment, the defaulting party must establish the absence of intent or conscious indifference in failing to appear at trial by proof that he was not given notice of the default judgment hearing; if that element is established, he is not required to set up a meritorious defense. *Almandarez v. Valentin*, 14-10-00085-CV, 2011 WL 2120115, at *4 (Tex. App.—Houston [14th Dist.] May 24, 2011, no pet.) (mem. op.) (per curiam) (citing *Mathis v. Lockwood*, 166 S.W.3d 743, 744 (Tex. 2005) (per curiam)). In this case, however, Fardad, does not argue that he failed to receive notice of the trial setting at which the trial court rendered default judgment against him. Thus Fardad must still prove that his absence was not intentional or the result of conscious indifference and the remaining elements of *Craddock*.

Fardad set a hearing on his motion for new trial and sent Valerie notice of the hearing, but our record contains no reporter's record for that hearing. It is the appellant who bears the burden of bringing forward a sufficient record to show the trial court's error. *Id.*, 2011 WL 2120115, at *5 (citing *Christiansen v. Prezelski*, 782 S.W.2d 842, 843 (Tex. 1990)). Without a complete record, we must presume the missing portions of the record would support the trial court's decision. *In re D.A.P.*, 267 S.W.3d 485, 487 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Looking solely at Fardad's affidavit, we know that he knew of the trial setting but claimed to be out of the country on the day of trial. We do not know when he left or what efforts he made to return for trial. His affidavit did not

16

establish a meritorious defense to the property division, nor did his affidavit establish that a new trial would not harm Valerie. Because Fardad failed to meet the elements of *Craddock*, the trial court did not err in denying his motion for a new trial. We overrule Fardad's fourth issue.

## E. Property Division

Finally, Fardad argues that the trial court abused its discretion in dividing the marital estate in accordance with Valerie's proposed division because the evidence was factually and legally insufficient to support that division. Under section 7.001 of the Texas Family Code, the trial court must divide community property in a "just and right" manner. TEX. FAM. CODE ANN. § 7.001 (West Supp. 2011). It is well established that a trial court may exercise wide discretion in ordering a property division. *Bell v. Bell*, 513 S.W.2d 20, 22 (Tex. 1974). The division of property need not be equal and it is presumed that the trial court properly exercised its discretion in determining the value and division of marital property. *Id.* We review an alleged error in dividing marital property for an abuse of that discretion. *Id.* Legal and factual sufficiency are relevant factors, rather than independent bases for reversal, in determining whether the trial court abused its discretion. *See Beaumont Bank v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991); *London v. London*, 94 S.W.3d 139, 143–44 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

Fardad argues that (1) Valerie's proposed property division, financial information sheet, and sworn trial inventory and appraisement were never admitted into evidence and were not properly subject to the trial court's judicial notice; and (2) the remaining evidence is insufficient to support Valerie's reimbursement claims or her valuation of some of Fardad's assets. *See Tschirhart v. Tschirhart*, 876 S.W.2d 507, 508 (Tex. App.—Austin 1994, no writ) ("We believe an inventory and appraisement is analogous to a pleading . . . unless a party's inventory is formally admitted into evidence at trial, that party may not rely on the inventory as evidence on appeal."); *Guyton v. Monteau*, 332 S.W.3d 687, 692–93 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (trial court abused its discretion in taking

17

judicial notice of all documents and testimony in the case to determine whether applicant was suitable to administer estate). *Contra Vannerson v. Vannerson*, 857 S.W.2d 659, 670–71 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (trial court did not abuse its discretion in considering inventory not introduced into evidence because the trial court could have taken judicial notice of it).

First, we disagree that Valerie's supporting documents were not offered before the trial court as evidence. When Valerie began her testimony on the contents of the inventory, the trial court asked whether she was requesting that the trial court "take judicial notice of [the inventory] for evidentiary purposes" if she were asked about "each and every item" in the inventory, and further inquired whether she was "offering it as a shorthand rendition of her testimony." Valerie's attorney answered affirmatively to both questions. The inventory was therefore offered and admitted before the trial court as evidence relevant to division of the parties' property.

Second, with respect to Fardad's contention that the evidence is insufficient to support Valerie's reimbursement claims or her valuation of certain assets, each party in a divorce proceeding has a burden to present sufficient evidence of the value of the community estate to enable the trial court to make a just and right division. *Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981); *Finch v. Finch*, 825 S.W.2d 218, 221 (Tex. App.—Houston [1st Dist.] 1992, no writ). "When a party does not provide values for property to be divided, that party may not complain on appeal that the trial court lacked sufficient information to properly divide the property." *Deltuva v. Deltuva*, 113 S.W.3d 882, 887 (Tex. App.—Dallas 2003, no pet.); *accord Todd v. Todd*, 173 S.W.3d 126, 129 (Tex. App.—Fort Worth 2005, pet. denied); *Tschirhart*, 876 S.W.2d at 509. Fardad complains there was no testimony to support the value of his watch collection on the inventory or for alleged unpaid spousal support. He further complains that Valerie had insufficient information to prove the amount wasted by Fardad during the marriage. Valerie's inventory contained a stated value for all of the assets except for a condominium

Fardad owned in Iran and certain life insurance policies on Fardad. She attached copies of bank account statements that were in Fardad's name alone. She noted in the inventory that Fardad listed those accounts as having a balance of zero in his bankruptcy filings. The court accepted the inventory as a shorthand rendition of her testimony.

Fardad was ordered to produce a trial inventory as early as October 16, 2008. He failed to do so. As noted above, both parties were bound by a restraining order from "making any withdrawals from any checking, savings, or brokerage account in any financial institution, for any purpose," except as authorized by the trial court. Fardad repeatedly violated this order by withdrawing money from his accounts, and he also failed to comply with the trial court's discovery orders and to pay Valerie's attorneys' and experts' fees. The trial court warned Fardad that failure to comply with these orders would result in Fardad's pleadings being struck. On this record, Fardad cannot now complain that the trial judge lacked complete information on which to base the division of property. *See Vannerson*, 857 S.W. 2d at 670. We overrule Fardad's final issue on appeal.

## IV. CONCLUSION

We conclude that the trial court correctly denied Fardad's special appearance and did not abuse its discretion in allowing Frankfort to withdraw, denying Fardad's motions for continuance and a new trial, or adopting Valerie's requested division of the marital estate. Consequently, we affirm.

/s/     Tracy Christopher
        Justice

Panel consists of Chief Justice Hedges and Justices Christopher and Jamison.

19