# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00197-CV

---

**Rosalinda Trevino, Appellant**

**v.**

**Brian O'Quinn, Appellee**

---

**FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-FM-17-003420,
THE HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

In this appeal from a suit to modify the parent-child relationship, Rosalinda Trevino challenges the trial court's final order that appointed Brian O'Quinn the child's sole managing conservator, appointed Trevino the child's possessory conservator, and limited Trevino's access and possession to supervised visits with the child three times a month. For the following reasons, we affirm the trial court's order.

### Background

The child was born in August 2014, her birth certificate designates O'Quinn as her father, and the parties signed an acknowledgement of paternity shortly after she was born.

In January 2016, a trial court in Hidalgo County signed an order in a suit affecting the parent-child relationship that was based on a mediated settlement agreement between the

parties who were never married to each other. The trial court appointed the parties joint-managing conservators of the child; ordered that Trevino had the exclusive right to designate the child's primary residence; ordered O'Quinn to pay child support; and specified O'Quinn's periods of possession. O'Quinn's visitation rights were for a period of four hours every day, at least two hours on the child's birthday, and on Saturdays two weekends per month from 8:00 a.m. to 8:00 p.m.

In February 2017, O'Quinn filed a petition to modify the parent-child relationship in the trial court in Hidalgo County and motion to transfer the case to Travis County because the parties and the child had resided in Travis County for over six months preceding the commencement of the modification suit. The trial court in Hidalgo County granted the motion to transfer the case to Travis County in March 2017. After the case was transferred, the trial court in Travis County appointed a guardian ad litem for the child and ordered O'Quinn to submit to genetic testing. On September 25, 2017, the trial court also entered interim orders that designated O'Quinn's periods of possession and an order requiring a psychological examination of Trevino. Shortly after entering the interim orders, however, the trial court entered a temporary restraining order against Trevino, requiring visitation with Trevino to be supervised, and ordered a writ of attachment requiring the child to be delivered to O'Quinn.

The trial court's temporary restraining order and writ of attachment were based on O'Quinn's verified motion that was supported by his affidavit and medical records from Dell Children's Medical Center. The medical records documented the child's emergency visit to the hospital for possible sexual assault on August 30, 2017. The records reflect that the child arrived at the medical center at 3:22 a.m.; that Trevino was requesting that the child, who was three-years old, be tested for sexually transmitted diseases; that medical personnel did not perform this

testing because they determined it was not necessary; and that Trevino "may [have been] in mental health crisis as evidenced by labile affect, pressured speech and tangential thought processing" and "delusional thought processes as evidenced by narrative."[1]

In his affidavit, O'Quinn averred that he had "been denied possession and access to the child"; that Trevino "regularly neglects the child's physical and emotional needs," providing specific examples; and that Trevino had "unaddressed mental health concerns that substantially impair the child's physical health and emotional development and place the child at immediate risk of physical and emotional harm." He also averred about Trevino's threats to remove the child from Travis County to California or Mexico;[2] her threats "to take, keep,

_____

[1] The narrative in the medical records states in part:

> Mother [Trevino] reports ongoing litigation re: custody of Pt [the child] with Pt's identified father, Brian Albert O'Quinn. . . . Mother reports she wants Pt's "hymen" checked. Mother reports she needs to know if Pt's "hymen is intact." Mother reports that there are many governmental entities involved with the investigation of Pt's sexual abuse by her identified father, Brian O'Quinn. Mother says "FBI," "International Affairs," and "Special Victims Unit" are investigating allegations that Pt was sexually abused by Brian O'Quinn. Mother reports she has "44 hours" of recordings related to the sexual abuse of Pt. Mother was unable to produce recordings. Mother reports she is concerned that Pt with redness to her vagina, "lesions" to the vagina and Pt said, "Daddy did it!" Mother reports that she has asked for Pt to have STI screenings since 2015. . . . Mother states, "It's all a bunch of Fascism." Mother reports that she feels her "brain is all over the place" and doesn't clarify what this statement means. Mother reports Pt's identified father, Brian O'Quinn, "sends people to my house" and sleeping outside her window "every night." Mother reports Brian O'Quinn slept outside of her window, "you know when it was cold outside." Recent weather in Texas is warm at night and hot during the day. . . . Mother reports anger directed at judge involved in custodial litigation. Mother reports motivation to harm the judge with no plan at this time. Mother reports motivation to harm Pt's identified father, Brian O'Quinn, with no plan at this time. . . .

[2] O'Quinn averred that Trevino "is estranged from her family in Texas and regularly communicates with family and friends in Mexico"; she "lacks a reason to stay in the United

3

withhold, and conceal the child in violation of [his] right to possession and access to the child"; her "false physical and sexual abuse allegations" against him and others; her demands that the child be tested for sexually transmitted diseases and to determine if the child's hymen was intact; and her statements to the child that O'Quinn "was not the child's father and that she, [Trevino], would be taking the child soon and the child would no longer have to see any of 'these people.'"

After the child was delivered to O'Quinn pursuant to the court order in September 2017, the child resided with him, and Trevino only had supervised visitation with the child during the case's pendency. Although she had been represented by counsel at times in the trial court and has counsel on appeal, Trevino represented herself at the time of the January 2018 bench trial. A few days before the trial, Trevino filed a motion for continuance. Among the asserted grounds, she contended that the "proper parties to this case have not been brought into the case" because O'Quinn had been determined not to be the child's biological father based on the genetic testing, the biological father had not been noticed of the case or hearing, and Trevino's current husband, whom Trevino alleged was the child's presumed father, had not been notified of the case or hearing. The trial court did not grant Trevino's motion and proceeded to trial. *See* Tex. R. Civ. P. 251.

The witnesses at trial included the parties, detectives who investigated Trevino's allegations against O'Quinn, O'Quinn's mother, and the guardian ad litem. The admitted exhibits included the child's birth certificate, the parties' acknowledgement of paternity, the

States as she is presently financially independent, able to work outside the United States, and is presently unemployed"; and she "has a long history of failing to comply with a court order including the most recent order issued by this court."

4

medical records from Dell Children's Medical Center concerning the child's emergency visit on August 30, 2017, and the psychological evaluation of Trevino dated September 30, 2017.

O'Quinn testified about the parties' relationships with each other and the child and his reasons for requesting modification. He testified that he had been involved with the child from her birth, he was concerned that Trevino might try to take the child to live in Mexico, and Trevino's allegations against him and others were "all false" and "heinous and extreme allegations." He continued to request that the court limit Trevino to supervised visits "because [he did not] know what [Trevino was] capable of physically" and that he "[felt] like the first chance she gets she is going to leave with [the child]." O'Quinn's mother also testified that, if the trial court returned the child to Trevino, she was "afraid [Trevino] would take [the child] and leave the country and we would never see [the child] again." She testified that the child was "very happy" living with O'Quinn and did not want to talk to or be returned to Trevino, and she provided details about the child's home life and daily routine since she had been living with O'Quinn. As to the child's interactions with Trevino, O'Quinn's mother testified that the child had "night terrors" after she had conversations with Trevino.

The detectives testified about their respective investigations of Trevino's allegations against O'Quinn. An Austin Police Department detective testified that all cases had been closed as "unfounded" and that "prosecution [had been] declined"; that some of Trevino's allegations "caused [him] to wonder maybe about her mental state" because they "just seemed a little far-fetched";[3] and that he was concerned for the child based on Trevino's mental state. He

---

[3] One of Trevino's allegations was that O'Quinn and "possibly his mother had filed [the child]'s teeth to expose cavities to make [Trevino] appear to be an unfit parent," but evidence showed that she had not taken the child to the dentist.

5

testified that he investigated 13 different allegations, beginning in February 2017, and that many of the allegations came around the time of court hearings.[4]  A Pflugerville Police Department detective testified that he was dispatched to Trevino's home around 1:00 a.m. on August 30, 2017, for a welfare check after Trevino had reported sexual assault of the child.  After his arrival at her house, Trevino called EMS, and EMS transported the child to Dell Children's Medical Center.  As part of the detective's investigation, he interviewed Trevino and spoke with medical personnel at the medical center.  The personnel from the medical center informed him that, while Trevino was there with the child, Trevino was "going through a psychotic episode"; she "appeared to be delusional, paranoid"; and she stated "repeatedly" that she "wanted to harm [O'Quinn] and the bitch Judge."  Based on his interactions with Trevino, the Detective described her "emotional state" as "unstable."  He also testified about his concerns because of photographs of the child that Trevino showed to him on her phone, including "completely nude" photographs and a photograph of a "hand that was opening the child's vagina."  Based on his investigation, he determined that there had been no sexual assault.

Trevino testified about the parties' relationships with each other and the child, her allegations against O'Quinn and others, and the parties' actions during the case's pendency.  Although she testified that the child "does need" O'Quinn and that she wants O'Quinn to stay in the child's life, she made allegations against O'Quinn and others.  Trevino alleged that O'Quinn's mother had poisoned her, that O'Quinn had vandalized her car, and that O'Quinn had allowed rectal penetration of the child on "more than 15 occasions."  Trevino, however, conceded that the alleged rectal penetrations were when a doctor was taking the child's

---

[4]  He also testified about a "timeline" or "chart" that Trevino had provided him.  Trevino contended to the trial court that she "presented the timeline with 508 different crimes."

temperature by using a rectal thermometer. Although the evidence was conflicting, there was evidence that Trevino previously had accused O'Quinn of shooting a gun at her. At trial, she denied that she had accused O'Quinn of shooting a gun at her. She testified that, during a trip to Louisiana, an unidentified person shot a gun at her but that "conveniently enough the person who shot at [her] was from Texas."

The final witness was the guardian ad litem. She testified about her involvement in the case, including her interactions with the parties and the child. She expressed concern about Trevino's "mental health" and its effect on the child. Trevino was diagnosed with Schizotypical Personality Disorder. The guardian ad litem recommended that Trevino's visits with the child continue to be supervised and limited to two-hour visits on a weekly basis until Trevino completed a three-month Dialectical Behavior Therapy program.

In the final order, the trial court generally followed the guardian ad litem's recommendations concerning access and possession. The trial court appointed O'Quinn the child's sole managing conservator, Trevino the child's possessory conservator, and gave Trevino supervised visits three times each month with increased hours upon completion of the three-month therapy program. Specifically, the trial court ordered that Trevino was entitled to supervised visitation with the child as follows:

> Phase I: on the 1st, 3rd, and 5th Saturdays of each month beginning at 10:00 a.m. and concluding at Noon the same day.
>
> Phase II: on the 1st, 3rd, and 5th Saturdays of each month beginning at 10:00 a.m. and concluding at 6:00 p.m. the same day.
>
> It is ordered that Rosalinda Trevino's possession and access shall begin at Phase I. Rosalinda Trevino's possession and access shall move to Phase II upon successful completion of the 3-month Dialectical Behavior Therapy program at Seton Behavior Health Care.

7

The trial court also entered findings of fact and conclusions of law. This appeal followed.

## Analysis

### Preservation of Error

As a preliminary matter, O'Quinn argues that Trevino failed to preserve any error for this Court's review and that Trevino has not brought forth a sufficient record to show that the trial court erred. O'Quinn asserts that Trevino only requested a partial reporter's record and that she "did not offer the evidence referenced in her brief supporting her arguments on appeal to the trial court." *See* Tex. R. App. P. 33.1(a) (addressing preservation of appellate complaints), 34.6(c) (addressing effect on appellate points or issues when appellant requests partial reporter's record). Although we agree with O'Quinn that our review is limited to the evidence that is properly in the appellate record, we conclude that Trevino sufficiently requested the reporter's record, and it is adequate for us to consider the issues in her appeal. Thus, we decline to find that she failed to preserve the issues that she raises on appeal based on an insufficient record, and we turn to our analysis of her issues.

### Restrictions on Trevino's Access to the Child

In her first issue, Trevino argues that the trial court abused its discretion "by placing extreme restrictions on [her] access to the child." She argues that "there was no evidence that [she] had physically harmed the child," "there was virtually no evidence of any alleged emotional harm suffered by the child," and "[t]here was no evidence produced that the child's emotional well-being was affected by [her] alleged improper conduct against [O'Quinn]."

In its findings of fact, the trial court's findings in support of varying the period of possession from a standard possession order and requiring supervised visits included:

8

- The mental health diagnosis of Rosalinda Trevino.

- The evidence of poor decision making of Rosalinda Trevino, . . . .

- The evidence of contradictory testimony of Rosalinda Trevino regarding the paternity of the child at issue.

- The continued, unfounded allegations by Rosalinda Trevino against Brian O'Quinn and the child's pediatrician for sexual assault.

- There is credible evidence that awarding Rosalinda Trevino unsupervised access to the child would endanger the child's physical health and emotional development.

- The Modified Phased Possession Order is designed to protect the safety and well-being of the child.

- The Modified Phased Possession Order is in the best interest of the child.

When a trial court modifies conservatorship, we review that decision under an abuse-of-discretion standard. *See Zeifman v. Michels*, 212 S.W.3d 582, 587–88 (Tex. App.—Austin 2006, pet. denied) (explaining that trial court's decision to modify conservatorship is reviewed under abuse-of-discretion standard and describing two-pronged inquiry as "whether the trial court had sufficient information on which to exercise its discretion" and "whether the trial court erred in its application of discretion"); *see also Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (holding that "trial court did not abuse its discretion in awarding custody of minor child to her father"; concluding that there was "sufficient competent evidence to support the trial court's determination that the best interest of the child would be served by appointing her father as managing conservator"; and explaining that "trial court is given wide latitude in determining the best interests of a minor child"). The trial court, the observer of "the witnesses' demeanor and personalities," does not abuse its discretion "as long as some evidence of a substantive and probative character exists to support the trial court's decision." *Zeifman*, 212 S.W.3d at 587.

9

A trial court may modify conservatorship and possession and access to a child, including modifying the "frequency and duration of visits," if the petitioning parent shows that the circumstances of the child, a conservator, or some other affected party "have materially and substantially changed" and that modification would be in the best interest of the child. *See* Tex. Fam. Code § 156.101(a)(1); *In re L.M.M*, No. 03-04-00452-CV, 2005 Tex. App. LEXIS 7191, at *28–29 (Tex. App.—Austin Aug. 31, 2005, no pet.) (mem. op.) (explaining that trial court has discretion to determine terms and conditions of conservatorship, including "frequency and duration of visits, as well as the limitations and safeguards to be placed on such visits"). The child's best interest is the "primary consideration of the court in determining the issue of conservatorship and possession of and access to the child." Tex. Fam. Code § 153.002.

But "[t]he terms of an order that denies possession of a child to a parent or imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child." *Id.* § 153.193; *see id.* § 153.256 (setting forth guidelines when trial court orders terms of possession under order other than standard possession order); *L.M.M.*, 2005 Tex. App. LEXIS 7191, at *29–30 (explaining that trial court cannot deny conservator's rights of possession and access absent finding that child's physical and emotional welfare would be endangered by possession and access and that "any limitations placed on such rights cannot exceed that required to protect the child's best interest"). We carefully review "severe limits" on a parent's contact with his or her children. *See Blackwell v. Humble*, 241 S.W.3d 707, 720 (Tex. App.—Austin 2007, no pet.) (explaining that "severe limits placed on [mother's] contact with her children still require our careful review").

10

Factors that courts have cited in support of their decisions to limit a parent's possession and access to her child to supervised visits include the parent's inability to follow court orders, attempts to alienate the child from the other parent, and actions that improperly deny the other parent contact with the child. *See In re Harrison*, 557 S.W.3d 99, 132–33 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (concluding that trial court "reasonably could have concluded that maintaining supervised visits and limiting [mother]'s periods of possession were the minimal restrictions necessary to protect the children's best interest"; citing evidence that mother "displayed an inability to follow court orders grounded on the child's best interests, secreted the children from [the father] when she shared custody with him, and attempted to alienate the children from [the father]"; and collecting cases in which attempt to alienate child from other parent was "guiding consideration in making possession and access determinations"); *see also Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing non-exclusive factors for making best interest determinations including "emotional and physical danger to the child now and in the future," "the parental abilities of the individuals seeking custody," and "acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one").

In this case, evidence showed that, in violation of court orders and a Rule 11 agreement between the parties, Trevino repeatedly refused O'Quinn's designated periods of possession and that she told the child that O'Quinn was not her father. Evidence showed that, in violation of a court order, Trevino did not allow O'Quinn to see the child for a period of five or six months after O'Quinn refused Trevino's request that he pay for her to take the child on a trip. Trevino also refused O'Quinn's designated periods of possession that were specified in the Rule 11 Agreement.

Other evidence at trial showed that Trevino made false reports against O'Quinn and others, including allegations of sexual abuse of the child, after O'Quinn filed the modification petition. Trevino's allegations to the police, Child Protective Services, and medical personnel resulted in multiple investigations that were all closed with no action being taken against O'Quinn. O'Quinn also testified that: (i) Trevino's allegations were false, (ii) he gave "everything" including his computer to the investigators, and (iii) he had never been arrested or convicted of a crime. O'Quinn and the guardian ad litem further testified about their concerns for the child because of Trevino's mental health issues, and O'Quinn and his mother testified about their concerns that Trevino would try to leave the country with the child and go to Mexico. Trevino also testified that she was married to a man named Torres who lived in Mexico and that Torres was willing to take care of the child. Although Trevino testified that she would not take the child to Mexico, she testified that she did not know if Torres was allowed in the United States or how she would raise the child with Torres if he was in Mexico and she was in the United States.

The evidence included the psychological evaluation of Trevino that contained her diagnosis of Schizotypical Personality Disorder and the guardian ad litem's recommendation that Trevino complete a Dialectical Behavioral Therapy program before the length of her visits with the child was increased. Evidence showed that this disorder was "very difficult to treat" and that its traits included "extreme paranoid ideation," "[i]ntense social anxiety," and dysfunctional relationships. Other evidence showed that Trevino's conduct with the child was improper, including the Pflugerville Police Department detective's testimony about the photographs of the child on Trevino's phone, the evidence concerning her conduct and statements during the child's

12

emergency visit at Dell Children's Medical Center in August 2017, and the child's "night terrors" after she talked with Trevino.

Based on our careful review of the record, we conclude that there was "evidence of a substantive and probative character" that protecting the child's best interest required Trevino's access to the child to be limited to three supervised visits each month. *See Harrison*, 557 S.W.3d at 112, 132–33 (concluding that "some evidence of a substantive and probative character supports the trial court's decision" to limit parent to four hours of "supervised possession" twice a month); *see also* Tex. Fam. Code § 153.193; *Holley*, 544 S.W.2d at 371–72; *Hinojosa v. Hinojosa*, No. 14-11-00989-CV, 2013 Tex. App. LEXIS 4504, at *20 (Tex. App.— Houston [14th Dist.] Apr. 9, 2013, no pet.) (mem. op.) ("[A] trial court is permitted to place conditions on a parent's access, such as supervised visitation, if necessary for the child's best interest."); *Zeifman*, 212 S.W.3d at 587–88.

As support for her position that the trial court abused its discretion by limiting her access to the child, Trevino cites this Court's opinion in *Blackwell v. Humble*. We, however, do not find our analysis in this case inconsistent with our analysis in that case. In *Blackwell*, the mother challenged the trial court's decision to limit her access to her children to two supervised visits each month. *See* 241 S.W.3d at 712. The trial court did not make findings of fact, but it continued the mother's appointment as joint managing conservator. *Id*. at 720. In that context, we explained that "[t]he trial court's denial of [the mother]'s possession and its severe restrictions on her access to the children give rise to implied findings that conflict with those arising from her continued status as a joint managing conservator of the children." *Id.* Given this conflict in the findings, we reversed the portion of the judgment restricting the mother's access and remanded the case to the trial court for further proceedings, explaining that we

13

"[could not] adequately review the trial court's severe restriction on [the mother]'s possession of and access to her children." *Id.* at 723. In contrast, the trial court here made express findings, including that its modified phased possession order was in the child's best interest, and appointed O'Quinn the child's sole managing conservator.

Because we have concluded that there was evidence of a substantive and probative character to support the trial court's decision to limit Trevino's possession and access to the child to three supervised visits each month, we conclude that the trial court did not abuse its discretion by doing so. *See Harrison*, 557 S.W.3d at 132–33; *Zeifman*, 212 S.W.3d at 587–88; *see also In re O.G.*, No. 05-13-01263-CV, 2014 Tex. App. LEXIS 7021, at *7 (Tex. App.— Dallas June 26, 2014, no pet.) (mem. op.) (explaining that "question of conservatorship of a child is left to the trial court's discretion because it is in the best position to observe the demeanor and personalities of the witnesses and can feel the forces, powers, and influences that cannot be discerned by merely reading the record" (citation and internal citations omitted)). We overrule Trevino's first issue.

**Parentage of Child and Motion for Continuance**

In her second issue, Trevino argues that the trial court erred by adjudicating O'Quinn to be the child's father and by failing to grant a continuance. She contends that O'Quinn was not the presumed father because he was not married to her, *see* Tex. Fam. Code § 160.204 (addressing presumptions of paternity applicable to husbands), and that he was not the biological father based on genetic testing. She further argues that the trial court should have granted her motion for continuance because the "true father was not made a party of these proceedings so that the child's rights could be adjudicated."

14

The trial court, however, did not adjudicate that O'Quinn was the child's father but ordered that Trevino was estopped from denying paternity. *See Stamper v. Knox*, 254 S.W.3d 537, 543–44 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (addressing application of equitable estoppel in paternity action and stating elements of doctrine); *Hausman v. Hausman*, 199 S.W.3d 38, 42–43 (Tex. App.—San Antonio 2006, no pet.) (same); *see also In re Shockley*, 123 S.W.3d 642, 652 (Tex. App.—El Paso 2003, no pet.) (explaining policy reasons for applying estoppel in paternity actions to include that "children should be secure in knowing who their parents are" and that, "[i]f a person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father she has known all her life is not in fact her father)."

In the final order in this case, the trial court found:

- Petitioner, Brian O'Quinn is the only father [the child] has ever known;

- Petitioner Brian O'Quinn had no reason to ever question the paternity of [the child];

- Petitioner Brian O'Quinn was present at the birth of [the child] and signed the child's birth certificate as her father;

- Respondent gave the child Petitioner's last name;

- Respondent and Petitioner executed an acknowledgment of paternity in the hospital after [the child]'s birth on August 14, 2014;

- For the first three and a half years of [the child]'s life Respondent, Rosalinda Trevino actively misrepresented that Brian O'Quinn was the father of [the child];

- Respondent knew paternity of [the child] might be in question and never disclosed this fact to Petitioner;

- Respondent voluntarily entered in to a Court Ordered parenting plan with Petitioner regarding [the child] in December of 2015 when [the child] was just one year old;

15

- Brian O'Quinn was adjudicated the father of [the child] in a prior final court order; and Respondent intended for Petitioner to take the role of father for [the child];

- The Court further finds that it is in the best interest of [the child] to estop Respondent Rosalinda Trevino from denying Petitioner Brian O'Quinn's paternity.

The trial court also entered findings of fact in support of its decision to estop Trevino from challenging paternity that track the elements of estoppel and concluded that she was equitably estopped from litigating the parentage of the child. *See Stamper*, 254 S.W.3d at 543–44; *Hausman*, 199 S.W.3d at 42–43.

Trevino argues that "[e]stoppel as stated in *Shockley* does not apply because there was a presumed father in this case." The 2016 final order that was based on the parties' mediated settlement agreement, however, established O'Quinn as the child's father, and Trevino did not appeal from that order. *See* Tex. Fam. Code §§ 160.201 (stating that father-child relationship is established between man and child by father's acknowledgement of paternity); 160.308 (generally precluding collateral attack on acknowledgement of paternity "after the issuance of an order affecting the child identified in the acknowledgement, including an order relating to support of the child"); 160.637 (generally binding all signatories to acknowledgement of paternity); *see also Hagen v. Hagen*, 282 S.W.3d 899, 902 (Tex. 2009) ("As with other final, unappealed judgments which are regular on their face, divorce decrees and judgments are not vulnerable to collateral attack."); *Reiss v. Reiss*, 118 S.W.3d 439, 443 (Tex. 2003) (concluding that party could not collaterally attack divorce decree and that it was final absent direct appeal).

As part of her second issue, Trevino also argues that the trial court erred by failing to grant a continuance because the "true father was not made a party of these proceedings so that

the child's rights could be adjudicated." Among the grounds asserted in her written motion for a continuance that was filed a few days before the trial, Trevino asserted that the "proper parties to this case have not been brought into the case." She contended that the child's biological and presumed fathers should have been notified of the case or hearing and were not.

We review a trial court's denial of a motion for continuance for abuse of discretion. *See Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004) (reviewing trial court's denial of motion for continuance for abuse of discretion and describing abuse of discretion standard of review); *Aduli v. Aduli*, 368 S.W.3d 805, 818 (Tex. App.— Houston [14th Dist.] 2012, no pet.) (stating that appellate courts review denial of motion for continuance for abuse of discretion). A continuance may not be granted "except for sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." Tex. R. Civ. P. 251. The trial court's findings of fact included:

- Good cause did not exist to remove the case from the docket.
- There was no sufficient cause to support a continuance of the matter before the Court.
- Rosalinda Trevino's motion for continuance was brought solely for delay.

Consistent with the trial court's findings, we observe that the trial court was not adjudicating paternity in this modification suit between Trevino and O'Quinn. In the procedural context of this case, the persons whom Trevino alleged were the child's alleged presumed and biological fathers were non-parties who were not entitled to notice, *see* Tex. R. Civ. P. 21 (setting forth service requirements including that parties be served with notice of trial setting), and, thus, any

17

lack of notice to them was not a sufficient reason for a continuance.[5]   On this record, we conclude that the trial court did not abuse its discretion when it denied Trevino's request for a continuance a few days before the scheduled trial.  *See Joe*, 145 S.W.3d at 161; *Aduli*, 368 S.W.3d at 818.

We overrule Trevino's second issue.

## Conclusion

Having overruled Trevino's issues, we affirm the trial court's final order.

_____

Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Baker

Affirmed

Filed:  August 30, 2019

---

[5]   Trevino did not attempt to bring the men whom she alleges are the presumed and biological fathers into this suit.  *See* Tex. R. Civ. P. 37.  She also does not explain how she has standing to complain about lack of notice to non-parties. *See SBI Invs., LLC v. Quantum Materials Corp.*, No. 03-17-00863-CV, 2018 Tex. App. LEXIS 1740, at *12 (Tex. App.—Austin Mar. 8, 2018, no pet.) (mem. op.) (concluding that appellants failed to show how they were "personally aggrieved" by alleged lack of notice to third party of hearing setting).  Further, she does not explain why she was unable to notify the alleged biological or presumed fathers of the case that had been pending for approximately one year before the trial occurred.  *See, e.g.*, *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004) (considering nonexclusive factors when deciding whether trial court abused discretion in denying motion for continuance seeking additional time to conduct discovery, including length of time case had been on file and whether party seeking continuance had exercised due diligence to obtain discovery that it sought).

18