**Opinion issued December 18, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00449-CV

———————————

**RONALD V. MATHIS, Appellant**

**V.**

**KAREN E. MATHIS, Appellee**

---

**On Appeal from the 507th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-22731**

---

## MEMORANDUM OPINION

A trial court granted a divorce to Ronald Mathis and Karen Mathis and divided the community estate such that Ronald was awarded shares in two closely-held entities and Karen was awarded an equalized judgment. Smaller-value items were also divided. The trial court also awarded Karen spousal maintenance.

Ronald raises 11 issues in his appeal of the trial court's judgment. In the first six issues, he contends that the property division is manifestly unfair and unjust because the ownership interest in a business was mischaracterized as a community asset and the ownership interest in that and another business was overvalued; a tax debt was ignored; a car lease was treated as an asset; money in corporate bank accounts was treated as a community asset; and finally, given these errors, the equalized judgment was excessive and erroneous. In a seventh issue, he contends that the trial court abused its discretion in awarding spousal maintenance. In two more issues, he challenges the trial court's order related to insurance policies. And in the last two issues, he contends that the trial court erred in awarding appellate fees.

Because both the husband's and the wife's opinion on the value of the two closely-held entities had no evidentiary support, and no other evidence supported the trial court's valuation, the trial court abused its discretion in dividing the community estate. We therefore reverse and remand.

## Background

Karen and Ronald Mathis were married in 1980. Both have degrees in computer programming, but neither pursued a career related to their educational focus. Ronald played professional baseball for years and now runs two companies involved in sanctioning youth baseball tournaments. Karen has had little outside

2

employment. Instead, she has focused on raising the couple's four children, the youngest of whom is a student and continues to depend on his parents financially.

In 2009, Karen had surgery to correct a herniated disk. The surgery left her with unrelenting nerve pain, which she describes as feeling "like there's a clamp" on her foot. She had a second surgery in 2011 to alleviate the nerve pain, but the surgery was unsuccessful. Karen takes the maximum daily dose of pain medications yet is in constant pain.

The same year as Karen's second surgery, Ronald's friendship with another woman began to evolve. According to Karen, Ronald eventually admitted to her that the relationship had developed into an extramarital affair. At trial, Ronald disputed Karen's statement. He testified that the relationship never became physical. But he admitted that he has maintained some level of relationship with the woman and her teenage son since 2011. And a handwritten letter Ronald wrote to the woman that year contains several affectionate references.

In 2016, Ronald filed for divorce. Karen countersued for divorce on the basis of adultery. They were the only two witnesses at trial. Both testified about their 37-year marriage, the state of their finances, and their community assets. Karen testified that the couple's income has always been primarily from Ronald's work—first playing professional baseball, then running two baseball-related entities. For the last several years, Ronald's gross income from these endeavors has

3

averaged around $20,000 monthly. Karen has worked part-time in retail the last couple years, grossing $900 monthly. Since their separation, Karen has found additional, sporadic work as a standardized patient at Baylor College of Medicine, at a pay of $20 per hour. Also since their separation, Ronald has expended an average of $5,000 in community funds each month to pay Karen's rent and some of her living expenses.

Both Karen and Ronald testified about the ownership and value of the two companies Ronald operates. They own Nations Baseball Association LLC, which according to Karen is a national entity with several, individual part-owners. It sanctions youth baseball tournaments across the country and pays Ronald $5,000 monthly to "run the company." According to Karen, when Ronald has not received his monthly pay, it has been because "he decides not to pay himself." The couple also owns South Texas Nations Baseball, Inc., a local affiliated entity that has provided Ronald an average monthly income of $15,000. According to Karen, Ronald also pays most of his living expenses through South Texas Baseball, including meals, clothing, cell phone charges, utilities, and health insurance premiums. Contrary to Karen's testimony, Ronald testified that, although these personal expenses have been paid through the South Texas Baseball bank account, these personal expenses are later segregated from business expenses for tax and accounting purposes.

4

Ronald agreed that his monthly gross income has averaged around $20,000 for the past several years. Nonetheless, he testified that the couple is essentially broke. He said that the family's expenses exceed his income, so he has "robbed Peter to pay Paul." According to Ronald, the couple does not own a home in Texas, and their home in Arizona has a negative value due to home equity loans and tax liens. He attributed his decision to end the marriage to his desire to "get away" from "Karen's spending habits" so he can have "a reprieve to try to pay bills" and "make ends meet." He also acknowledged that, for the past couple years, he has held his income—community funds—in the South Texas Baseball bank account so that Karen could not access it.

Ronald agreed with Karen that the couple owns a partial interest in Nations Baseball and 100 percent of South Texas Baseball. In addition to these two business assets, the community estate includes a home in Arizona, vehicles, bank and retirement accounts, and insurance policies. The couple also has various debts (including credit card debts), and, according to Ronald, a tax lien and a debt to his mother.

The trial court granted a divorce on the grounds of Ronald's adultery. The trial court specifically found that Ronald "was not a credible witness." The court announced a "just and right division of the property" after holding that any interest either spouse held in Nations Baseball and South Texas Baseball was a community

5

asset and that the businesses were worth $200,000 and $500,000, respectively, which exactly matched the entities' values listed in Karen's submitted inventory.

The trial court awarded the community's interest in both businesses to Ronald, and it awarded Karen an equalized judgment of $380,000, which was heavily linked to the values assigned to the two entities. The trial court also awarded Karen spousal maintenance of just over $4,000 per month for ten years. Ronald appeals.

### Applicable Law of Division of Community Estate

In a divorce, the trial court orders a division of the parties' community estate in a manner that the court deems just and right, having due regard for each party's rights. TEX. FAM. CODE § 7.001. The trial court is afforded broad discretion in dividing the community estate, and we must indulge every reasonable presumption in favor of the trial court's proper exercise of its discretion. *Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998); *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981); *Motley v. Motley*, 390 S.W.3d 689, 695 (Tex. App.—Dallas 2012, no pet.).

Under the abuse of discretion standard, a lack of legally or factually sufficient evidence does not constitute an independent ground for asserting error; instead, it is a relevant factor in determining whether the trial court abused its discretion. *Pickens v. Pickens*, 62 S.W.3d 212, 214 (Tex. App.—Dallas 2001, pet. denied). When a sufficiency review overlaps the abuse-of-discretion standard, we

engage in a two-pronged inquiry: (1) whether the trial court had sufficient information to exercise its discretion and (2) whether the trial court erred in its application of discretion. *Sandone v. Miller–Sandone*, 116 S.W.3d 204, 206 (Tex. App.—El Paso 2003, no pet.). The traditional sufficiency review comes into play under the first prong. *Id.*

It is the responsibility of both divorcing spouses to provide the trial judge with sufficient valuation evidence to enable the court to make a just and right division of marital property. *Murff*, 615 S.W.2d at 698–99; *Aduli v. Aduli*, 368 S.W.3d 805, 820 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Finch v. Finch*, 825 S.W.2d 218, 221 (Tex. App.—Houston [1st Dist.] 1992, no writ). If "a party does not provide values for property to be divided, that party may not complain on appeal that the trial court lacked sufficient information to properly divide property." *Deltuva v. Deltuva*, 113 S.W.3d 882, 887 (Tex. App.—Dallas 2003, no pet.); *accord Aduli*, 368 S.W.3d at 820; *Todd v. Todd*, 173 S.W.3d 126, 129 (Tex. App.—Fort Worth 2005, pet. denied). But that rule is not without exception: an appellate court will not uphold a property division if there is no evidence in the record to support the trial court's valuation and division. *See Sandone*, 116 S.W.3d at 207–08 (holding that, when both parties fail to put on any valuation evidence, no "just and right" division can be determined).

Lack of evidentiary support will not require reversal, though, if the challenged property is of such a relatively small value that its grant to one party cannot be said to have materially impacted the property division or resulted in a manifestly unjust and unfair division. *See Robles v. Robles*, 965 S.W.2d 605, 621–22 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) ("If . . . mischaracterized property had only a *de minimis* effect on the trial court's just and right division, then the trial court's error is not an abuse of discretion."); *see also Odom v. Odom*, No. 12-06-00218-CV, 2007 WL 677800, at *2 (Tex. App.—Tyler Mar. 7, 2007, no pet.) (mem. op.); *Sandone*, 116 S.W.3d at 207–08.

Thus, for significant assets (assets worth enough within the scheme of the couple's community estate to materially impact whether a property division is just and right), there must be sufficient evidence in the record to support the value assigned; if there is not, the trial court abuses its discretion by not fulfilling its duty under Family Code section 7.001 to divide the community property in a just and right manner. *Murff*, 615 S.W.2d at 698–99; *see* TEX. FAM. CODE § 7.001. "The failure of the parties to put on evidence as to value does not absolve the trial court of fulfilling this duty," and an appellate court cannot ensure a just and right division was had if "the trial court has no evidence of what exactly it is dividing" or the value of the assets to be divided. *Odom*, 2007 WL 677800, at *2.

If there is adequate evidence for the trial court to exercise its discretion in dividing the property, we proceed to determine whether, based on the elicited evidence, the trial court divided the property in an arbitrary or unreasonable manner. *Sandone*, 116 S.W.3d at 206. The division of community property need not be equal, and a trial court may consider many factors when exercising its broad discretion to divide property. *Murff*, 615 S.W.2d at 699; *Barras v. Barras*, 396 S.W.3d 154, 163 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Such factors include the nature of the marital property; the relative earning capacity and business opportunities of the parties; the parties' relative financial condition and obligations; the parties' education; the size of the separate estates; the age, health, and physical condition of the parties; any fault in breaking up the marriage; the benefit the innocent spouse would have received had the marriage continued; and the probable need for future support. *Murff*, 615 S.W.2d at 699; *Barras*, 396 S.W.3d at 163.

The trial court may also award a money judgment as part of a just and right division of the community estate. *Finch*, 825 S.W.2d at 224; *Hanson v. Hanson*, 672 S.W.2d 274, 278–79 (Tex. App.—Houston [14th Dist.] 1984, writ dism'd). The trial court may secure the money judgment with an equitable lien in the community property awarded to the other spouse. *See Hanson*, 672 S.W.2d at 274; *see also* Richard R. Orsinger, Patrice L. Ferguson, & Bryan H. Polk, *Dividing*

*Ownership Interests in Closely-Held Business Entities: Things to Know and to Avoid*, 42nd Annual Advanced Family Law Course, Chapter 26 at 28 (State Bar of Texas 2016).

The party complaining about an improper division of the community estate has the burden of showing from the evidence that the trial court's division was so unjust and unfair as to constitute an abuse of discretion. *See Mann v. Mann*, 607 S.W.2d 243, 245 (Tex. 1980); *Pappas v. Pappas*, No. 03–12–00177–CV, 2013 WL 150300, at *1 (Tex. App.—Austin Jan. 10, 2013, no pet.) (mem. op.); *Vannerson v. Vannerson*, 857 S.W.2d 659, 672 (Tex. App.—Houston [1st Dist.] 1993, writ denied).

Ronald raises 11 issues in this appeal, but most center on the classification, valuation, and division of the community estate. We turn first to the community's interest in Nations Baseball and South Texas Baseball.

## Classification, Valuation, and Division of Community Interest in Businesses

Ronald runs two businesses: Nations Baseball and South Texas Baseball. Both are corporate entities.

### A. Classification of a family business's worth

A spouse is entitled to a division of the property that the community owns at the time of divorce. *Mandell v. Mandell*, 310 S.W.3d 531, 539 (Tex. App.—Fort Worth 2010, pet. denied). When the couple owns a family business that is in the

form of a corporation, the corporation is treated as a separate legal entity from its shareholders, officers, and directors. *Sparks v. Booth*, 232 S.W.3d 853, 868 (Tex. App.—Dallas 2007, no pet.). Property owned by a corporation is not a divorcing shareholder's separate property or community property; instead, it is a corporate asset. *Gonzales v. Dallas Cty. Appraisal Dist.*, 05-13-01658-CV, 2015 WL 3866530, at *3 (Tex. App.—Dallas June 23, 2015, no pet.) (mem. op.); *Mandell*, 310 S.W.3d at 539. Thus, a corporate entity's assets are not subject to community-property division in a divorce. *Mandell*, 310 S.W.3d at 539; *see Legrand–Brock*, 246 S.W.3d at 322. Neither are the future earnings that a corporate entity will pay a divorcing spouse. *Id.*; *Von Hohn v. Von Hohn*, 260 S.W.3d 631, 640–41 (Tex. App.—Tyler 2008, no pet.).

## B.     Classification of Nations Baseball[1]

Nations Baseball is a limited liability company. According to trial testimony, Nations Baseball is a closely held entity owned by a small number of people, including Ronald. No party testified that Ronald's interest in Nations Baseball was anything other than a distinct asset. But on appeal, Ronald argues that it is not a distinct entity. He argues that the ownership interest in Nations Baseball is held by a corporate entity—South Texas Baseball—and is not part of the community estate. Thus, according to Ronald, the trial court should have only divided South

---

[1]     The parties do not dispute the proper classification of South Texas Baseball; its shares are community property.

11

Texas Baseball, not both as distinct entities. Ronald's argument on appeal is based on the following statement of law: "While a spouse's ownership interest in a corporation can be characterized as either separate or community property, corporate assets and liabilities are owned by the corporation and, absent a finding of alter ego, are not part of the community estate." *In re Marriage of Collier*, 419 S.W.3d 390, 403 (Tex. App.—Amarillo 2011, no pet.).

At trial, though, Ronald testified that he owns Nations Baseball, along with a couple other "people." He described himself as a "shareholder" in Nations Baseball. He stated that he held 33 percent of the interest in the company in 2013 but that other people have been brought in since then, intimating that his share has diminished as a result. Ronald never testified what percent of Nations Baseball he owned at the time of trial. And he never argued that Nations Baseball was anything other than a distinct asset. Karen also testified that any ownership in Nations Baseball was held by Ronald as community property. Thus, neither party testified that Ronald's interest in Nations Baseball was anything other than a community interest in a distinct and divisible entity.

Ronald's late argument regarding the proper characterization of Nations Baseball has insufficient evidentiary support to conclude that the trial court erred in its findings. Ronald did not testify that South Texas Baseball owns the relevant interest in Nations Baseball, and the record includes some documentary evidence

to support each possible theory of ownership. For example, the trial evidence includes a 2015 K-1 tax filing that lists Nations Baseball as an asset of South Texas Baseball and states that South Texas Baseball owns a 19.2 percent interest in the other entity. Also, Ronald's inventory refers to Nations Baseball as a "closely held business interest[]" that is "taxed as a partnership" and "held by" South Texas Baseball. It further refers to South Texas Baseball as having a "sole asset" of "19.2% member interest in Nations Baseball." This evidence supports Ronald's assertion on appeal that the relevant ownership percentage in Nations Baseball is a corporate asset belonging to South Texas Baseball (which is undisputedly a community owned entity) and is not a directly divisible community asset belonging to the divorcing spouses.

But another trial exhibit, Nations Baseball's Statement of Assets, Liabilities and Equity, states that the entity has close to $329,000 in equity and identifies the members and their distributions and capital as follows:

| | |
|---|---|
| Member distribution – Ron Mathis | (88.20) |
| Member's Capital – Don | 37,796.64 |
| Member's Capital – Ron | 37,796.64 |
| Member's Capital – Sean | 37,796.64 |
| Member's Capital – Steve | 38,328.66 |

This document suggests individual ownership of Nations Baseball, which is consistent with Ronald's trial testimony that he owns the partial interest in Nations Baseball, making it a distinct entity subject to a just and right division.

There is some evidence to support classification of Nations Baseball as a corporate asset held by the community-owned South Texas Baseball entity and other evidence to support classification of the relevant ownership interest in Nations Baseball as a divisible community asset partially owned by Ronald. Because the trial court was presented with conflicting documentary evidence and Ronald's own testimony supports the conclusion that he individually owns the partial interest in Nations Baseball, we conclude that the trial court did not err in classifying the ownership interest in Nations Baseball as a distinct and divisible community asset. *See Newberry v. Newberry*, 351 S.W.3d 552, 564 (Tex. App.—El Paso 2011, no pet.) (holding that trial court did not abuse discretion in accepting some witness testimony and rejecting other, contrary evidence in dividing community estate).

## C.   Valuation and division of interest in two companies

Ronald contends that the trial court erred in valuing Nations Baseball and South Texas Baseball and in dividing the community estate based on the erroneous valuations.

## 1. Valuation evidence

### a. Nations Baseball

During her trial testimony, Karen valued the interest in Nations Baseball at $500,000 and stated that she reached that figure by taking "two and a half times how much it pays" Ronald. Both parties agree that Ronald earns $60,000 annually ($5,000 monthly) from Nations Baseball; therefore, it is unclear how Karen arrived at a valuation of $500,000. Karen's inventory did not match her testimony. There, she valued the interest in Nations Baseball at $200,000 (and valued South Texas Baseball at $500,000).

Ronald listed Nations Baseball on his inventory as having a value of zero dollars. That valuation was based on his view that Nations Baseball's operating agreement prohibits him and other owners from selling their interest in the entity. We discuss this agreement in more detail below but note here that, while the agreement places restrictions on the members' ability to demand the purchase of their shares, it does not prevent the members from selling their shares to interested and approved buyers. The agreement contemplates such a sale by setting forth a method to determine the value of shares to be sold. On cross-examination, Ronald conceded that he does not know what the shareholder agreement allows regarding assignment or transfer of members' shares.

The Nations Baseball checkbook register for 2016 shows consistent payments from Nations Baseball to South Texas Baseball throughout the year, averaging more than $25,000 monthly. There was no testimony concerning how these payments impact the value of Nations Baseball or South Texas Baseball.

### b. South Texas Baseball

Karen's inventory listed South Texas Baseball at a value of $200,000. Karen did not explain how she arrived at that figure. In fact, she did not testify about this entity's value at all. She did testify that the couple holds 100 percent interest in the entity and that it pays Ronald an average of $15,000 monthly ($180,000 annually).

Like with Nations Baseball, Ronald's inventory listed the value of South Texas Baseball at zero dollars. Ronald testified that South Texas Baseball does not have any value apart from his daily work, for which he is paid an income. Further, according to Ronald, it had no sale value. He testified that the other Nations Baseball owners would not have any interest in owning South Texas Baseball because "their contacts, their people that they know, their teams, their coaches that they are familiar with are in their areas. And . . . it would be like starting all over if they came down here" and tried to operate the South Texas Baseball entity.

Karen disputed Ronald's testimony, stating that she believes South Texas Baseball could be sold "to the right person" so long as Nations Baseball approved

the sale. Ronald then agreed that South Texas Baseball might be an attractive business for a local high school baseball coach.

When asked about a hypothetical scenario in which he moves out of state, Ronald acknowledged that he would attempt to sell South Texas Baseball for a profit, not shutter the business. In discussing that scenario, Ronald testified: "I don't have any idea what I would ask" as a sale price; "I don't even know what it's worth"; and "I've never really thought about it."

Then Ronald was asked about selling his interest in Nations Baseball, to which Ronald testified that Nations Baseball "could" have some value if he "stuck around for a while and tried to train somebody" to operate the business properly, that he "would establish some kind of figure" as a sale price if he tried to sell it to one of the other part-owners, that he likely "would talk to somebody that might know a little bit more about it so that [he] could have a better idea" of its value, and that he did not, at the time of trial, "know what that figure would be."

Neither party submitted South Texas Baseball corporate governance documents into evidence, but Ronald did submit some bank statements listing a balance for one South Texas account of $102.37 and for the other of $7,197.29.[2]

---

[2]      The trial court characterized the money held in these two South Texas Baseball bank accounts as distinct community assets separate from the value of South Texas Baseball and, therefore, divisible. The first account is at Chase Bank and has a balance of $102.37. The second account is at Frost Bank and has a balance of $7,197.29. Neither Ronald nor Karen testified about these two accounts.

In the end, Ronald agreed that, although he listed the values for the two entities as zero dollars, the two entities "possibly" do have some value to a potential buyer, although he "never really thought about" what that value might be.

Neither party presented expert testimony on the valuation issue. Ronald and Karen were the only trial witnesses to discuss valuation.

## 2. Methods to determine the value of closely held entities

The parties agree that both these entities are closely held and that at least one of them should be part of the division of the community estate. There are multiple methods of establishing the value of community property. We consider whether the

---

Ronald's inventory lists both accounts as belonging to South Texas Baseball. A bank statement from Chase Bank was admitted into evidence. It lists the accountholder as South Texas Baseball. A bank statement from Frost Bank was also admitted into evidence. It too lists the accountholder as South Texas Baseball. Karen's inventory is consistent with Ronald's. She designated both accounts as "business ST Nations" and listed their balances as "unknown." She never testified that these were anything other than the corporate accounts of South Texas Baseball.

Corporate assets and liabilities are owned by the corporation and, absent a finding of alter ego, are not part of the community estate. *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 854 (Tex. 2011) (stating that "shareholders of a corporation are not owners of corporate assets"); *see In re Marriage of Collier*, 419 S.W.3d 390, 403 (Tex. App.—Amarillo 2011, no pet.); *Thomas v. Thomas*, 738 S.W.2d 342, 343 (Tex. App.—Houston [1st Dist.] 1987, writ denied). Karen did not argue alter ego, and the trial court's findings and conclusions fail to mention that or any other theory that might transform South Texas Baseball's corporate assets into divisible community property. On this evidence, there was insufficient evidence to list the balances in these two corporate accounts as distinct, divisible community assets.

18

parties presented sufficient evidence to permit the trial court to have determined the value of either South Texas Baseball or Nations Baseball.

### a. Market value

As a general rule, the method to value community property that is to be divided in a divorce proceeding is "market value." *R.V.K. v. L.L.K.*, 103 S.W.3d 612, 618 (Tex. App.—San Antonio 2003, no pet.); *Mandell*, 310 S.W.3d at 536. "Fair market value" is defined as "the price at which [property] would change hands between a willing seller, under no compulsion to sell, and a willing buyer, under no compulsion to buy, with both parties having reasonable knowledge of relevant facts." *Id.*

The Property Owner Rule permits a property owner who has satisfied the requirements of Rule 701 "to testify to the market value of his property." *Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 669 (Tex. 1996) (concluding that property owner's testimony provided legally sufficient evidence of market value of owner's personal property). An owner's testimony about market value is, however, subject to some limitations. *Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984).

One limitation is that the owner-witness must testify about the property's market value, not some other valuation method. *See Accurate Precision Plating, LLC v. Guerrero*, No. 01-14-00706-CV, 2015 WL 7455826, at *3 (Tex. App.—Houston [1st Dist.] Nov. 24, 2015, pet. denied) (mem. op.) (limiting Property

Owner Rule to real and personal property that "has a market value" after noting that rule is based on presumption that property owners are familiar with their property and market for its potential sale); *see also Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 155 (Tex. 2012).

Another limitation is that the owner-witness must present evidence of their "personal familiarity with both the property and its value." *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 852 (Tex. 2011). This is because the Property Owner Rule "falls within the ambit of Rule 701" and therefore is based on the presumption that property owners ordinarily have personal knowledge of their property and its market value. *Id.* at 853. In other words, the rule is premised on the assumption that property owners will "have a sound basis for testifying as to its value." *Speedy Stop Food Stores, Ltd. v. Reid Rd. Mun. Util. Dist. No. 2*, 282 S.W.3d 652, 657–58 (Tex. App.—Houston [14th Dist.] 2009), *aff'd*, 337 S.W.3d at 858. While the Property Owner Rule permits either spouse to opine on the value of a community asset, the rule applies only if the owner demonstrates familiarity with both the asset and its market value. *Reid*, 337 S.W.3d at 853. A property owner demonstrates the requisite qualifications to testify as to a property's value if the owner's testimony includes factors relevant to the market value, versus what might be better considered intrinsic or personal value. *Charles Clark Chevrolet Co. v. Garcia*, No. 13-08-00633-CV, 2010 WL

20

1407103, at *3 (Tex. App.—Corpus Christi Apr. 8, 2010, no pet.) (mem. op.). If the property owner cannot satisfy these requirements, the owner's opinion on the asset's value is conclusory and no evidence.

Karen did not specify whether she was relying on market value or some other valuation method. The evidence cannot support her valuation figures as a market value for several reasons. First, Karen testified that she reached her value for Nations Baseball by taking "two and a half times how much it pays him." But that value is far more than Ronald's annual $60,000 salary from that entity. Also, she gave no basis at all for her valuation of South Texas Baseball at $200,000. Even if we were to assume she confused the two entities, the math does not work.[3] Second, Karen failed to establish the economic integrity of using a valuation model that is based on two and one-half times the salary of a part-owner. Third, Karen did not present any evidence that she was familiar with either closely-held entity. She did not testify that she had any involvement in their operations, reviewed their financial or other records, or attended meetings with either entity's accountants or other owners. She did not testify concerning any future plans or strategies for either company or compare their current and past operations or income or competitors (or the lack of other competitors) in the marketplace. Fourth, Karen

---

[3] The values Karen listed in her inventory were $500,000 and $200,000. Ronald's annual income from one entity was $180,000 and from the other entity was $60,000. Neither income multiplied by two and one-half equals $500,000 or $200,000.

did not account for the restrictions on the sale of the couple's share of Nations Baseball.

Examples of additional information that could be relevant to value but for which Karen did not state any familiarity or knowledge include (1) general market conditions for determining the value of a closely-held entity, (2) general market conditions for determining the value of an entity with a comparable income stream, (3) general market conditions for determining the value of an entity engaged in a similar business, (4) the appropriate multiplier to be used in determining value and whether that multiplier should be based on income alone or include other factors such as interest, taxes, and depreciation, (5) the appropriate discount rate to be used when the corporate documents restrict a sale, (6) the value of the corporate assets or the amount of its liabilities, and (7) details regarding the 2013 prior sale by a shareholder and whether the company has increased or decreased in value since that sale.[4] While we are not holding that an owner-witness must be familiar

---

[4] A former part-owner of Nations Baseball left the company in 2013 and sold his 40 percent ownership to the three remaining members. The amount the former member was paid for his shares was based on an appraisal, though there was no evidence of how that appraisal was performed or by whom. Ronald testified that the part-owner was paid "per the appraisal" in the amount of $120,000 for his 40 percent interest. That equals $3,000 for each percent ownership in Nations Baseball. The other owners agreed to the sale price, and each purchased one-third of the seller's 40 percent interest, thereby increasing Ronald's stake in Nations Baseball to 33 percent ownership. But no one asserted that this appraisal remained accurate at trial, likely because there were no documents introduced showing the financial condition of Nations Baseball in 2013 and comparing it to its financial condition at the time of trial. *See Mandell*, 310 S.W.3d at 537 (explaining that

with these specific matters to be familiar with a company's value, the owner-witness must articulate some evidentiary basis to show familiarity not just generally with the company but with its value. Karen did not. Her evidence cannot support the trial court's valuations under a market value method.

The most significant reasons that Karen's valuations cannot be supported using a market value method are that Nations Baseball and South Texas Baseball are closely held entities and that the sale of their shares was restricted. Market value is not an appropriate valuation method when the property being valued is community-owned shares in a closely held entity that are subject to sale restrictions. *Mandell*, 310 S.W.3d at 537. In that situation, the fair market value is zero, but there are other valuation methods that may be used to determine the value of an interest in a closely held entity. *Id.*

### b.      Other valuation methods

Having determined that the evidence does not support the values for these entities using a market value method, we briefly identify a number of alternative options for determining the values of these two entities, recognizing that there may be other options as well. One option is to show the actual value of the property to the owner. *Id.*; *R.V.K.*, 103 S.W.3d at 618. Actual value of community stock is

"comparable sales" valuation method compares property to "similar, recently-sold property, and values the to-be-valued property in relation to the recent sales prices for similar property").

shown by evidence of benefits derived from stock ownership, "such as driving a new automobile, having health insurance paid for by the company, having a company-financed life insurance policy, belonging to a country club at company expense, or gaining any other similar financial benefit." *Mandell*, 310 S.W.3d at 537. But neither party presented evidence of the monetary value of these benefits separate from Ronald's income. Nor did either party attempt to tie these benefits to a valuation opinion for either entity.

A second valuation option is the comparable-sales method, which compares the property being valued with similar, recently sold properties. *Id.* But the parties did not attempt to set a value based on this method either.

Yet another valuation option is to consider whether the corporate documents specify a method of valuing the company. *See Beavers v. Beavers*, 675 S.W.2d 296, 299 (Tex. App.—Dallas 1984, no writ) (holding that, based on buy/sell agreement, book value was appropriate method to value stock); *see also Mandell*, 310 S.W.3d at 541 (relying on shareholder agreement as evidence of stock value for closely held entity subject to stock-sale restrictions). This option also was not used at trial.[5]

---

[5]     According to Ronald, after the part-owner sold his interest in Nations Baseball in 2013, the remaining owners decided to have corporate documents drafted that would limit their ability to demand a purchase of their shares. At first, Ronald testified that the agreement wholly prevented him from selling his shares in

### 3.    Whether the trial court erred in its valuation

The trial court categorized the interest in Nations Baseball and South Texas Baseball as two separate assets owned by the couple, and the trial court valued those interests in the same amount that Karen listed in her inventory—$200,000 and $500,000, respectively—without Karen providing any explanation for her valuation method. She testified (erroneously) that her valuation was based on a mathematical formula ($2.5 \times$ annual income) but never explained why she picked that particular formula. Why not four times annual income or a single year's income? What about a discount for lack of marketability? The record answers none of these questions.

Karen argues that Ronald waived his ability to challenge the valuations because he did not provide competing valuations. He responds that he did offer a valuation for both entities: zero dollars. And he argues that stating a value of zero

---

Nations Baseball. But Ronald later conceded that he is not sure what the agreement allows regarding the assignment or transfer of shares.

Article 12.2 of the shareholder agreement provides that, in the event of a dissociation of a member, the company has the right to purchase the member's shares "at a purchase price equal to the Computed Value of the Company multiplied by the Member's Profit Percentage" upon certain terms and conditions. The term *computed value* is found in the definition section of the agreement and is defined as follows: "Any actions by the company or individual owners that require a valuation of the company will be done by Bill Dale of Enterprise Value Consulting, LLC to calculate this value." There is no indication in the record that Bill Dale has performed a valuation calculation at anyone's request or that the parties were pursing this avenue of valuation.

dollars is not equivalent to providing no valuation. In principle, we agree. The cases on which Karen relies for her waiver argument involve a party failing to appear, failing to submit an inventory, or failing to provide any response when questioned about the value of an asset. *See Bello v. Bello*, No. 01-11-00594-CV, 2013 WL 4507876 (Tex. App.—Houston [1st Dist.] Aug. 22, 2013, no pet.) (mem. op.); *Aduli*, 368 S.W.3d at 805; *Deltuva*, 113 S.W.3d at 882. Ronald, in contrast, provided a proposed value: he said it was zero dollars. And, to the extent Ronald was testifying about the shares' market value—although it is not clear from the record that he was—case law supports an assertion that the market value of shares in a closely held company that are subject to sale restrictions is zero dollars. *See Mandell*, 310 S.W.3d at 537. But, as previously discussed, market value is not an appropriate valuation method when the community owns shares in a closely held entity and the sale of shares is restricted. *Id.* In that situation, another valuation method must be used. *Id.* Yet Ronald offered none. Nor did the rest of his testimony support the valuation he suggested. He testified as follows about the entities' values:

"I don't even know what it's worth."

"I don't have any idea what I would ask [for it if trying to sell it]."

"I don't know. I've never really thought about it."

26

Ronald's testimony establishes that he did not endeavor to fulfill his obligation to provide the trial court with needed valuation evidence. *Murff*, 615 S.W.2d at 698–99; *Aduli*, 368 S.W.3d at 820. He did not offer any expert testimony or reports. He did not offer corporate documents or financial records into evidence to support a valuation. He asserted a zero valuation for both entities even though he grosses over $20,000 monthly from these entities and, in addition to that money, Nations Baseball has paid his South Texas entity, on average, $24,000 monthly in 2016 and South Texas Baseball's bank account has funded some of the couple's normal living expenses. Further, Ronald testified that these entities had zero value while also testifying that, if he were trying to sell his interests, he "would attempt" to make money on the sales.

Ronald argues that he had no obligation to provide the trial court with evidentiary support to permit the trial court to determine a value of the community's assets and to divide the community estate; he argues that he could rest on his valuation of "zero value" because of the lack of a market value. We disagree. Both parties had an obligation to provide the factfinder with evidence of the companies' values. *Murff*, 615 S.W.2d at 698–99; *Aduli*, 368 S.W.3d at 820. Ronald, who handled the entities' daily operations, was particularly in a position to provide the trial court with valuation information. He did not. Yet we cannot agree that his failure is equivalent to what occurred in the cases on which Karen relies,

27

i.e., failing to appear, file an inventory, or respond to valuation questions. Accordingly, we hold that Ronald has not waived his ability to challenge the valuations on appeal.

Karen's inventory listed a value for each entity. Ronald's did too. But a sworn inventory is "simply another form of testimony" that must be supported by other evidence. *Viera v. Viera*, 331 S.W.3d 195, 207 (Tex. App.—El Paso 2011, no pet.); *see Cox v. Cox*, No. 01-15-00063-CV, 2016 WL 4055079, at *2 (Tex. App.—Houston [1st Dist.] July 28, 2016, no pet.) (mem. op.) (discussing sworn inventory in light of local Harris County rules that require divorcing parties to incorporate detailed information about assets and liabilities). Neither party provided the trial court with a basis for the valuations they suggested. Nor did they submit, for example, appraisals, expert reports, or financial data to support their valuation testimony.[6] Their inventories, as a result, were conclusory and provided

---

[6] At oral argument, Karen argued that a trial exhibit listed the value of the "Mathis Interest in Nations Baseball" at $99,000 and supports a conclusion that the entity's value is at least $99,000.

This exhibit lists the price paid by Ronald and his Nations Baseball co-owners when they purchased in 2013 the 40 percent ownership interest previously held by another co-owner. The exhibit divides that purchase price by the percentage of total shares that were purchased, then it multiples that amount by the percentage of shares owned by "Mathis" at some point—though not necessarily at the time of trial—to reach a total value of "Mathis interest" of $99,000. There is no evidence to support a conclusion that the shares at the time of divorce (2017) were worth the same amount as when they were purchased from the co-owner (2013). Nor is there evidence that the co-owners would offer a similar purchase price to Ronald given the changes to the operating agreement discussed during trial. Moreover,

insufficient evidentiary support for the trial court's determination of the entities'

values and the community estate's value as a whole. *See Wilson v. Wilson*, 132

S.W.3d 533, 538 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) ("Given the

dearth of evidence identifying, describing, and valuing the community estate, we

hold that there is insufficient evidence to support the division of assets."); *see also*

*Pickens*, 62 S.W.3d at 214 (stating that, under abuse-of-discretion standard,

evidentiary sufficiency is relevant factor in determining whether trial court has

abused its discretion). As a result, we conclude that the trial court abused its

discretion in ordering a division of the couple's community assets given the

magnitude of the assets in question compared to the entire community estate. *See*

*Sandone*, 116 S.W.3d at 207–08 (explaining that "[w]ithout the ability to

determine the size of the community pie, we can make no determination that the

slices awarded to each spouse were just and right" and holding that trial court

abused its discretion in dividing property without sufficient evidence); *see also*

*Finn v. Finn*, 658 S.W.2d 735, 746 (Tex. App.—Dallas 1983, writ ref'd n.r.e.)

(stating that, "without a proper valuation the trial court could not properly exercise

its discretion in making a 'just and right' division of community property"); *Mann*,

607 S.W.2d at 245 (noting need to determine value of community property subject

there is no evidence that the "Mathis interest" in Nations Baseball remained 33 percent at the time of trial. Neither party testified that it was. This document, without more, cannot support a valuation of the parties' financial interest in Nations Baseball.

to just and right division and affirming trial court's appointment of master in divorce that "involved numerous complex issues," including valuation of assets without regular market value).

**Conclusion**

We affirm the portion of the trial court's judgment that grants a divorce. We reverse the division of property. In a divorce proceeding, a trial court must order a division of the community estate in a manner that the court deems just and right. The parties did not provide the court with sufficient evidence, including valuation evidence, to perform this task. In the end, both Nations Baseball and South Texas Baseball were assigned valuations without sufficient evidentiary support. This was error.

When a trial court commits error in dividing property in a divorce, a court of appeals is not permitted to render a different division or to remand only certain portions of the marital property for a new division; rather, the reviewing court must remand the entire community estate for a new division. *Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985). Therefore, we reverse in its entirety the property division of the trial court and remand that issue for further proceedings consistent with this opinion, which necessarily includes proceedings concerning the value of the community estate and any equalized judgment. *See Quigley v. Willmore*, No. 09-08-00517-CV, 2009 WL 4062180, at *6 (Tex. App.—Beaumont Nov. 25, 2009,

30

no pet.) ("It is difficult to justify the use of a money judgment to achieve an equitable division of the estate without proper evidence of the value of the estate."); *see also Finn*, 658 S.W.2d at 746–47 (improper valuation required remand of entire property division); *Hanson*, 672 S.W.2d at 278 (considering nature and type of property in estate in determining whether use of money judgment appropriate to balance award of assets).

Because we are reversing and remanding, it is unnecessary to reach any other appealed issues in this case. *See* TEX. R. APP. P. 47.1.

Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Brown and Caughey.

31