In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00379-CV**

_____

**GARY MATTHEW SALSMAN, Appellant**

**V.**

**LORI DENISE SALSMAN, Appellee**

**On Appeal from the 410th District Court**
**Montgomery County, Texas**
**Trial Cause No. 22-07-08765-CV**

**MEMORANDUM OPINION**

Gary Matthew Salsman ("Gary") petitioned to divorce Lori Denise Salsman ("Lori") and appeals the trial court's Final Decree of Divorce.[1] In two issues, Gary challenges the trial court's property division and argues the trial court erred by: (1) awarding Lori a disproportionate share of the community estate because there was insufficient evidence to support such a division, and in support of this issue asserts

_____

[1]For purposes of clarity, we refer to the parties by their first names.

1

that Rule 193.6 barred her claim for a disproportionate award of the marital estate; and (2) dividing future grants from Gary's employer which were "contingent and discretionary and did not exist at the time of divorce," thus were his separate property. We hold: (1) Rule 193.6 did not bar Lori's claim for a disproportionate award; (2) the trial court did not abuse its discretion by awarding a disproportionate share to Lori, as evidence of a substantive and probative character supported this as a just and right division of the marital estate; and (3) some evidence supports the trial court's finding characterizing the grants as community property, and Gary failed to establish as a matter of law that the grants were his separate property, so the trial court did not err by dividing them. As discussed below, we overrule Gary's issues, and we affirm the trial court's judgment.

## BACKGROUND AND PROCEDURAL POSTURE

On August 8, 1998, Gary and Lori married. They ceased living together in April 2021. They had three children, but only one was a minor at the time of divorce. The parties agreed to all issues involving the children but tried the property issues to the bench.

On July 8, 2022, Gary filed his Original Petition for Divorce, alleging the marriage had become insupportable due to discord or conflict and sought a disproportionate award of the community estate. He amended his petition twice, and

2

on November 9, 2022, he filed his Second Amended Petition, which was the live pleading at the time of trial.

On August 2, 2022, Lori filed her Original Answer. The same day, she separately filed Respondent's Counter-Petition for Divorce, alleging the marriage had become insupportable due to discord or conflict and that Gary had committed adultery. Lori also alleged that Gary committed fraud on the community estate and asked that the court to "award her a greater share than that to be awarded to Gary" based on certain equitable factors. In May 2023, Lori filed another Counter-Petition for Divorce including those same allegations.

The parties tried the case to the bench. The sole issue at trial was the division of property. In the Final Decree of Divorce, the trial court awarded Lori approximately seventy percent of the community estate and awarded Gary thirty percent of the community estate. Included in the property division was a fifty-fifty award to each spouse of three "grants" from Gary's employer which both parties characterized as "community property" in their sworn inventories. Gary also characterized it as community property in his proposed division admitted into evidence at trial. When the trial court subsequently asked if there was anything the parties dispute as being part of the community estate, Gary's counsel responded only that they disputed that $100,000.00 in Lori's bank account was separate property. They did not assert that the grants were separate property.

3

On the record, the parties discussed the grants. Gary's attorney explained, "they are grants, so we're willing to stipulate that any future grants that he gets for work that was done while they were still married would be divided 50/50." He described the grants as being "like bonuses but they are not guaranteed. They are just projections[]" and stated that they are "[n]ot stock options." The parties agreed that for 2023, the grant would apply to 7.5 months, and for prior years where the grants were awarded for work done during the marriage but had not yet matured, they would be divided; the only question was how it would be divided. Gary's attorney clarified that the grants were not guaranteed, so if he lost his job, he would not get them. He also stated that the value of the grants "are estimates because it's a multiplying factor[,]" and "[i]t's confusing that's why I suggested just to divide it 50/50[.]"

The following exchange ensued:

[GARY'S ATTORNEY]: Well, when we present our case, we are stipulating to all exhibits.

THE COURT: Y'all are stipulating they are future -- there are contingent grants, essentially, for services performed during the marriage at his workplace, and those should be divided by the court. And for year 2023, y'all agree that 7 and a half months would be the community portion of that. Anything after that would be based on his employment after the divorce.

[WIFE'S COUNSEL]: Correct.

4

Additionally, the trial court ordered that a portion of the estate awarded to Lori be paid by Gary as a money judgment in the amount of $365,000. The Decree stated,

> The Court finds that, in order to achieve a just and right division of the parties' community property, it is necessary to award judgment for Respondent against Petitioner in the amount of three hundred sixty-five thousand dollars ($365,000.00), with interest at the rate of 8.25 percent per year.

> **IT IS ORDERED AND DECREED** that Respondent is awarded judgment against Petitioner in the amount of three hundred sixty-five thousand dollars ($365,000.00) with interest at the rate of 8.25 percent per year, compounded annually from the date of judgment, for which let execution issue.

> IT IS ORDERED the judgment shall be paid by Petitioner to Respondent, at her last known address, by paying Thirty-five Hundred Dollars ($3,500.00) on the first of each month beginning on September 1, 2023 and continuing on the 1st of each month thereafter until the judgment and interest thereon are paid in full.

> **IT IS FURTHER ORDERED AND DECREED** that this judgment is part of the division of the parties' community property and does not constitute, nor shall its existence be interpreted as, any form of alimony.

At Gary's request, on October 31, 2023, the trial court issued its initial Findings of Fact and Conclusions of Law. On November 2, 2023, the trial court issued Amended Findings of Fact and Conclusions of Law to correct a clerical error in one of the findings. The Amended Findings of Fact and Conclusions of Law included, among others, the following as relevant to this appeal:

5

18. The parties stipulated and agreed that the following assets are part of the community estate and further stipulated to their values:

| | |
|---|---|
| a. RBC checking account x1512 | Value: $2,936.30 |
| b. Fidelity account x1097 | Value: $38,340.00 |
| c. RBC Account x8399 | Value: $4,688.00 |
| d. Lori RRSP account | Value: $740.00 |
| e. RBC RRSP savings acct x1399 | Value: $40,248.00 |
| f. RBC Direct Investing acct x24JA | Value: $152,031.00 |
| g. TCE US Retirement acct | Value: $34,484.00 |
| h. TC Energy Supp. Pension Plan | Value: $841,618.00 |
| i. 2020 X7 automobile | Value: $50,818.00 |
| j. 2022 Ford Bronco | Value: $54,635.00 |
| k. 2013 Nissan Armada | Value: $8,583.00 |
| l. 2023 annual grant (7.5 months only) | Value: $74,531.25 |
| m. 2022 annual grant | Value: $105,999.00 |
| n. 2021 annual grant | Value: $134,006.00 |
| o. 2021 special grant | Value: $3,003.00 |

19. The court finds that the character of Respondent's Amegy account is community, and that the value of same was agreed upon as being $100,000.00. The court awarded this asset 100% to Respondent, and the award of that asset to Respondent was not contested (only its character was contested). Respondent did not rebut the community property presumption by clear and convincing evidence.

[. . .]

26. The court finds that a 50/50 division is not appropriate in this case due to the factors considered under *Murff v. Murff*.

27. The court finds that Petitioner testified that the largest account in the community estate, TC Energy Supplemental Pension Plan (valued at $841,618.00), could not be divided more than 50% to a party due to Canadian laws. This asset was divided 50% to each party.

28. The court finds that the Petitioner testified that he has to use phantom shares he is awarded from his company to purchase the shares in the TC Energy account and to maintain a value of at least his annual salary in that account (or in the RBC Direct Investing Account) in order

6

to meet the requirements of his employer. He testified that he had not quite reached that requirement. Petitioner further testified that the same principle applies as to the RSC Direct Investing account. He stated that it did not matter which of those two accounts held the value of one times his base salary so long as they were held in accordance with his employment agreement. He asked that these accounts be awarded to him for this reason and the court awarded him those accounts accordingly. This put a limitation on how the court could divide the marital estate and supports the money judgment awarded to Respondent by the court.

29. The court finds that Respondent testified that she had only briefly worked as a substitute teacher since 2011 and has been a stay at home mom for the majority of the marriage including at the time of trial. Respondent testified that she is looking for a job and that she would need liquid assets to be able to support herself after the divorce. Respondent is awarded primary custody of the two children remaining under the jurisdiction of the court, and she was awarded the marital residence where she and the children live. Petitioner was awarded his residence located at Tuam Street. The court finds that the Eaglecrest rental property is not an asset that can be quickly sold due to needed repairs and due to renters currently living in the property and the legal limitations that may exist in Canada as far as evicting the renters. These facts further support the disproportionate share and the money judgment awarded to Respondent in order to arrive at a just and right division of the marital estate.

30. The court finds that Respondent remained home taking care of the children of the marriage for a large part of the marriage and put her own career opportunities aside in order to fulfill that role. The court finds that Petitioner's salary, benefits, and future employment opportunities greatly exceed those of Respondent, who is unemployed and is still raising two of the children of the marriage and who has been out of the workplace for some time. The court finds that per Petitioner's 2022 W-2 form, Petitioner earned $539,735.43 in the year 2022. These facts further support the disproportionate share and the money judgment awarded to Respondent in order to arrive at a just and right division of the marital estate.

7

31. The court finds that a 30/70 division of the marital estate in favor of Respondent is a just and right division of the marital estate.

[. . .]

35. The court can divide community personal property by partitioning the property outright to one spouse and awarding the other spouse a money judgment as compensation for her interest in the property, and the court did so properly in this case.

In addition to the foregoing findings, the trial court also addressed each of the three real properties owned by the parties, stating that the parties stipulated and agreed to the value of the mortgages. The trial court also provided findings for the fair market value of each property, consistent with appraisal district records provided by the parties. The trial court found there was no dispute as to which party should get the Chantsong property and Tuam property. Regarding the Eaglecrest property in Canada, the trial court found the parties agreed to sell it and awarded thirty percent of the net sales proceeds to Gary and seventy percent to Lori.

Gary then filed his Request for Additional or Amended Findings of Fact and Conclusions of Law, which asked the trial court to address the $365,000.00 judgment payable to Lori. The trial court subsequently issued the Court's Response to Petitioner's Request for Additional Findings of Fact and Conclusions of Law, which included the following additional findings:

1. On November 8, 2023, Petitioner filed a request for additional findings of fact and conclusions of law solely on the issue pertaining to

8

the court's ruling on a money judgment awarded to Respondent as part of the just and right division of the marital estate.

2. The court finds that a money judgment in the sum of $365,000.00 and awarded to Respondent was necessary to reach a just and right division of the marital estate in this case and the court has already addressed the reasons for same in Findings numbered 24 through 31 and 34-36 in the court's "Amended Findings of Fact and Conclusions of Law" filed on November 2, 2023. The court incorporates those findings by reference with respect to specifically the money judgment upon which additional findings were requested.

3. The court finds that the court awarded interest on the principal sum of $365,000.00 "at the legal rate of interest for judgments," and that the interest rate was then supplied by the attorneys in the Final Decree of Divorce. The court finds that the interest rate ordered by the court does not violate usury interest laws and that the parties agreed to the interest rate reflected in the Final Decree of Divorce. Requested findings on agreed terms are inappropriate and no further findings are required of the court as to the interest rate included in the money judgment in the Final Decree of Divorce.

On November 30, 2023, Gary timely appealed.

## TRIAL EVIDENCE

**<u>Gary's Testimony</u>**

Gary testified that he is a vice president with TransCanada.[2] He explained certain limitations on his pension and requirements of his employment agreement under Canadian law. Gary explained that under Canadian law, his TC Supplemental

---

[2] The documentation and testimony indicated that TransCanada was an affiliate of TC Energy, and most of the financial documentation reflected it was from TC Energy. His official position within the company was "Vice-President, Field Operations in Houston, Texas with TransCanada USA Services, Inc."

Pension Plan of $841,618 can only be split fifty-fifty. Additionally, the terms of his employment as a vice president with TransCanada required him to maintain 100 percent of his annual base salary in TransCanada shares. So, the company grants "phantom shares" and each year, he must use fifty percent of the grant value to buy more shares until he hits the 100 percent threshold. Gary said there are restrictions on how he can sell the shares, and if he sold them and the value dropped below 100 percent of his base salary, he would not be following his employment agreement.

Gary explained that he received grants, which the parties discussed pretrial and described as "bonuses" for work done in 2021, 2022, and 2023 and that Petitioner's Exhibit 17 contains the formula for the payout of the grants. Gary represented that the grants are paid three years after they are awarded, and the exact amounts cannot be determined until about two weeks before they are paid. Gary testified that Petitioner's Exhibit 18 "is a summary of those ESU share grants from our internal TC benefits system. It includes the ESU grant summaries as well as the stock options that I was granted." The record shows that the grants were listed as community property on Gary's proposed division. Gary testified that he also receives stock options and explained how they worked; although they were awarded the last two years, he has never exercised the options, and they expire on a certain date.

Regarding the Eaglecrest property in Canada, Gary testified they want to sell the property. He said that the home is occupied by month-to-month renters and under

10

British Columbia's notice requirements, it would take several months after the renters receive notice before they must vacate the property.

Gary testified that their two oldest children are type 1 diabetics. He agreed that when they were younger, they required testing and treatment every couple of hours, which he helped with when he could, but often, due to his work, Lori was on her own. Gary conceded caring for the children was a full-time job for Lori. Until the children obtained automated insulin pumps, Lori went to their school twice a day to test them and provide insulin shots. Gary testified that Lori spent most of her time in the home caring for their children.

Gary testified that Lori supported his career development and "did a lot of work in raising the kids[.]" He said when he obtained an MBA, it required him to be away from home for three weeks. Gary traveled for work, and they moved several times for his job.

On rebuttal, Gary testified about the $100,000 in Lori's Amegy account. He explained that Lori transferred that money, and she was concerned that she did not have access to anything. According to Gary, he initially told her to move $10,000, then it was $90,000. He testified, "I didn't see it as a gift . . . [i]t was a reassurance that I was going to be a good person and not run away[.]" That said, Gary was fine with Lori keeping the $100,000. Gary testified that he had a live-in girlfriend for the

11

last year but denied spending $100,000 on her, although he admitted purchasing her gifts as outlined in written discovery.

**Lori's Testimony**

Lori testified that she and Gary married on August 8, 1998, and had three children. Lori lives in the Chantsong home and asked the court to use the Montgomery County Appraisal District value of $713,780 for the home. Lori stipulated to a net value of $209,172 on the Tuam property that Gary lived in.

Lori also provided testimony about the Eaglecrest property in Canada. She explained under British Columbia law that they cannot evict the tenants in the Canadian house, even with a court order to sell it. They will likely have to sell the home with the tenants living in there, and the "house is trashed[,]" so it will cost them a lot of money. Lori explained that the assessed value of the home was about $1.4 million, but given the condition of the home, it was closer to $1.1 million. There are required repairs of between $100,000 and $200,000 Canadian dollars, so she asked the court to use a $900,000 to $1 million Canadian sales price. Yet, they cannot repair it because the tenants are there, so it must be sold as is. If awarded the house in British Columbia, it would be a huge undertaking to clean out the home and described personal property there they would need to remove. She agreed that she had not toured the house recently, but indicated they have a property manager who provided information about the property's condition and needed repairs.

Lori testified that she has two degrees and worked previously. She taught school when their oldest child was born, but while pregnant with their second child, Gary's job took them to Quebec, so she left her job and moved across the country at eight months pregnant. Lori noted that since 2011, she worked very briefly teaching, but two of their children had serious medical issues, which required care. This included two trips to their school daily to deliver insulin. Lori also described their oldest child's serious medical issues. According to Lori, she developed epilepsy and autoimmune conditions, almost died "many times," and was hospitalized for most of 2014 and 2015. Lori testified that her life has been taken up by caring for the children and still is. Lori is currently unemployed but is looking for a job and has made "[h]undreds" of inquiries. Accordingly, she asked that the court maximize her amount of cash in the divorce and to award her liquid assets.

Lori said that Gary "diminished" her efforts, but she was still in charge of the children. Lori claimed that in the last few years, Gary did not participate in raising the children, but in the early days he was a "very good father[.]" Lori attributed this to his alcoholism and a third party. Lori also disputed Gary's testimony about how long he was out of the home earning his MBA and claimed he was gone for six to eight weeks.

Regarding the money in her Amegy account, Lori testified that Gary told her he was happy to give her a lump sum of money if that made her happy. Lori said that

13

Gary offered to put $90,000 in her new Amegy account, when she asked him to put $100,000 in, "he said sure" he was happy to do it, and she did not hear anything else about it. Lori testified the money was "very clearly a gift" and asked that the court find it is her separate property. Lori testified that the $100,000 in her separate Amegy account came from their joint account and was earned during the marriage but that "Gary often credited me for his success in his career." Despite this, Lori said, "I believe it's separate funds because he gave it to me as a gift to quell his guilt." She indicated Gary gave her many gifts during the marriage.

**Other Evidence**

The parties stipulated to the admission of all exhibits pretrial. The documentary evidence showed appraisals for the three real properties that the parties owned and which they agreed to, along with the principal balances of the mortgages. Other documentary evidence included correspondence from Gary's employer showing his compensation package, formulas for stock options and grant payouts, and summaries of grants awarded, among other things. Certain documents showed the value of Gary's pension plan and instructions stating it could be split only at fifty percent with the spouse. The parties also provided statements for various financial accounts and their values. The parties also submitted a W-2 for 2022, which showed Gary earned income of $539,735.43.

**PRELIMINARY MATTER: DISCOVERY RESPONSES**

We first address a preliminary matter. In connection with issue one, Gary contends in his brief that Lori failed to answer an interrogatory that asked for her legal theories justifying her request for a disproportionate award of the community estate, so Texas Rule of Civil Procedure 193.6 barred her from requesting a disproportionate share of the community estate. *See* Tex. R. Civ. P. 193.6. Specifically, when asked if Lori was asking for a disproportionate share of the community estate, she answered affirmatively. Then, for the first time, Gary's counsel objected "to that answer because in their interrogatories they never answer that question on wanting a disproportionate share and their basis." A copy of the interrogatories is not in the record, but Gary's attorney represented that Lori responded with "will supplement." Lori's attorney responded that they pled it in their counterpetition, and it was not a surprise. When the trial court then asked if Lori failed to respond to the question about legal theories in the disclosures, too, Gary's attorney replied, "Just the interrogatories."[3]

---

[3]At the time of this lawsuit, Rule 194.2, required parties to provide Initial Disclosures that included information about their legal theories and, in general, the factual basis of their claims or defenses and the amount and any method of calculating economic damages. *See* Tex. R. Civ. P. 194.2(b)(3), (4).

15

Rule 193.6 provides,

> **(a) Exclusion of evidence and exceptions.** A party who fails to make, amend, or supplement a discovery response, including a required disclosure, in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:
>
> > (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or
> >
> > (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.
>
> **(b) Burden of establishing exception.** The burden of establishing good cause or the lack of unfair surprise or unfair prejudice is on the party seeking to introduce the evidence or call the witness. A finding of good cause or of the lack of unfair surprise or unfair prejudice must be supported by the record.
>
> **(c) Continuance.** Even if the party seeking to introduce the evidence or call the witness fails to carry the burden under paragraph (b), the court may grant a continuance or temporarily postpone the trial to allow a response to be made, amended, or supplemented, and to allow opposing parties to conduct discovery regarding any new information presented by that response.

*See id.* The plain language of the Rule indicates that where a party fails to timely supplement, the party "may not introduce in evidence the material or information that was not timely disclosed[.]" *See id.* 193.6(a). It does not state that claims are barred, although evidence supporting those claims may be excluded. *See id.*

16

Both parties offered testimony, and Gary failed to object to any testimony regarding the property division based on Lori's failure to supplement under 193.6 until the trial was almost over.[4] The trial court stated that some of the information had already come in, and as to that information, "that's already been tried by consent, I'm going to allow it to remain." The trial court ruled that for anything beyond what had already come in, Lori would be limited to the interrogatory answers she provided. Gary did not move to strike any previous testimony.

The central issue at trial was property division. Lori's Counter-Petition requested that she be awarded a greater share of the community estate than Gary, and she pleaded that Gary committed adultery and fraud on the community estate. In asking for a disproportionate share of the community estate, she asked the trial court to consider enumerated equitable factors.

We hold that Rule 193.6 did not bar Lori's claim for a disproportionate award of the marital estate for failure to supplement her interrogatory answers where her Counter-Petition included a request for a disproportionate award and asked the court to divide the property based on a list of enumerated factors. To the extent Gary attempts to argue the trial court erred by failing to strike Lori's trial testimony before he raised this issue, we conclude he has failed to preserve this complaint for our

---

[4]The Reporter's Record shows that Gary did not object based on Lori's failure to supplement until page 113 of the transcript, which in total is 132 pages.

17

review where he did not timely object or move to strike. *See* Tex. R. App. P. 33.1(a) (requiring that the complaint was made to the trial court by a timely request, objection, or motion); *In re Commitment of Grinstead*, No. 09-07-00412-CV, 2008 WL 5501164, at *8–9 (Tex. App.—Beaumont Jan. 15, 2009, no pet.) (mem. op.) (concluding motion to strike was untimely and that party failed to preserve complaint to expert's testimony under Rule 215 where an opinion was not timely disclosed but the complaining party did not object during the expert's testimony); *Aluminum Chemicals (Bolivia), Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 69 (Tex. App.—Texarkana 2000, no pet.) (concluding that objection to testimony made the day after testimony was presented at trial due to a failure to supplement interrogatory answers was untimely and reasoning that "[w]e have found no instance where a claim of error is preserved when a party waits until the witness completes her testimony, without objection, and then asks the court on the next day to strike the testimony").

## ISSUES ONE AND TWO

### Standard of Review and Applicable Law

In a divorce case, the trial court must divide the parties' estate in a "just and right[]" manner. Tex. Fam. Code Ann. § 7.001. Trial courts may exercise wide discretion in ordering a property division. *See Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998); *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981); *Ohendalski v. Ohendalski*, 203 S.W.3d 910, 914 (Tex. App.—Beaumont 2006, no pet.). Thus,

18

we review a trial court's division of property for an abuse of discretion. *See Murff*, 615 S.W.2d at 698; *Ohendalski*, 203 S.W.3d at 914; *see also DiBassie v. DiBassie*, No. 09-20-00287-CV, 2022 WL 16973693, at *9 (Tex. App.—Beaumont Nov. 17, 2022, pet. denied) (mem. op.). The trial court's division of marital property "'should be corrected on appeal only where an abuse of discretion is shown in that the disposition made of some property is manifestly unjust and unfair.'" *Bradshaw v. Bradshaw*, 555 S.W.3d 539, 543 (Tex. 2018) (quoting *Hedtke v. Hedtke*, 248 S.W. 21, 23 (Tex. 1923)). A trial court abuses its discretion if it acts arbitrarily or unreasonably, and without reference to any guiding rules or principles. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

A trial court's property division need not be equal, and we presume the trial court properly exercised discretion in determining the value and division of marital property. *Bell v. Bell*, 513 S.W.2d 20, 22 (Tex. 1974); *see also Bennett v. Bennett*, No. 09-17-00162-CV, 2019 WL 1940859, at *10 (Tex. App.—Beaumont May 2, 2019, no pet.) (mem. op.). "A trial court may award an unequal division of marital property when a reasonable basis exists for doing so." *Bennett*, 2019 WL 1940859, at *10 (citing *Loaiza v. Loaiza*, 130 S.W.3d 894, 899 (Tex. App.—Fort Worth 2004, no pet.)). When dividing a marital estate, courts "may consider such factors as the spouses' capacities and abilities, benefits which the party not at fault would have derived from continuation of the marriage, business opportunities, education,

19

relative physical conditions, relative financial condition and obligations, disparity of ages, size of separate estates, and the nature of the property." *Murff*, 615 S.W.2d at 699; *see also Bradshaw*, 555 S.W.3d at 543 (citations omitted). "To determine whether the trial court divided the community estate in a 'just and right' manner, we must have the trial court's findings of the value of those assets." *DiBassie*, 2022 WL 16973693, at *9 (citing *In re Marriage of Harrison*, 557 S.W.3d 99, 141 (Tex. App.—Houston [14th Dist.] 2018, pet. denied)).

Property possessed by either's spouse during or at the dissolution of marriage is presumed to be community property. *See* Tex. Fam. Code Ann. § 3.003(a); *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011) (citations omitted). The party claiming certain property is separate bears the burden of rebutting the community property presumption. *See Pearson*, 332 S.W.3d at 363. To do so, they must trace and clearly identify the property in question as separate by clear and convincing evidence. *See id.* (citations omitted); *see also* Tex. Fam. Code Ann. § 3.003(b).

"Legal and factual sufficiency are relevant factors, rather than independent bases for reversal, in determining whether the trial court abused its discretion." *Aduli v. Aduli*, 368 S.W.3d 805, 819 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also Bennett*, 2019 WL 1940859, at *10. The party challenging the trial court's property division bears the heavy burden of showing the division was not just and

right. *See Bennett*, 2019 WL 1940859, at *10 (citing *Pletcher v. Goetz*, 9 S.W.3d 442, 446 (Tex. App.—Fort Worth 1999, pet. denied)). We do not substitute our judgment for the trial court's when reviewing the property division of a marital estate. *See McKnight v. McKnight*, 543 S.W.2d 863, 866 (Tex. 1976); *Bennett*, 2019 WL 1940859, at *10. "We engage in a two-pronged analysis in deciding whether the trial court abused its discretion: first, we consider whether the trial court had sufficient evidence upon which to exercise its discretion; and, second, we consider whether the trial court erred in its application of that discretion." *Bennett*, 2019 WL 1940859, at *10 (citing *Cantu v. Cantu*, 556 S.W.3d 420, 426 (Tex. App.—Houston [14th Dist.] 2018, no pet.)). A trial court does not abuse its discretion when some evidence of a substantive and probative character supports its decision. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002); *DiBassie*, 2022 WL 16973693, at *9.

In a bench trial, the judge is the factfinder and sole judge of the witnesses' credibility and weight to give their testimony. *See Murff*, 615 S.W.2d at 700; *DiBassie*, 2022 WL 16973693, at *9. We review a trial court's written conclusions of law de novo, and our review of the trial court's factual findings is limited to legal sufficiency. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We review the trial court's legal conclusions drawn from the facts to determine their correctness. *See id.*

21

"When a party attacks the legal sufficiency of the evidence supporting an adverse finding on an issue on which he has the burden of proof, he must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)); *DiBassie*, 2022 WL 16973693, at *9. In reviewing a challenged finding for legal sufficiency, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference supporting the challenged finding. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We first examine the record for evidence supporting the finding; if there is none, we examine the entire record to determine if the contrary proposition is established as a matter of law. *Dow Chem. Co.*, 46 S.W.3d at 241. In other words, "When a party attacks the legal sufficiency of an adverse finding on which [he] bore the burden of proof at trial, [he] must demonstrate both that no evidence supports the finding and that the evidence conclusively proves the contrary." *Sheen v. Sheen*, No. 03-18-00358-CV, 2019 WL 2554570, at *3 (Tex. App.—Austin June 21, 2019, no pet.) (mem. op.) (citing *Dow Chem. Co.*, 46 S.W.3d at 241).

We review a trial court's findings of fact for factual sufficiency of the evidence under the same legal standards as applied to review jury verdicts for factual sufficiency of the evidence. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996);

22

*DiBassie*, 2022 WL 16973693, at \*9. A party attacking the factual sufficiency of an adverse finding on an issue on which he had the burden of proof must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *See Dow Chem. Co.*, 46 S.W.3d at 242. We must consider and weigh all the evidence in a neutral light and will only set aside a verdict if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See id.* "In other words, we cannot substitute our judgment for the factfinder's if the evidence supports the challenged finding." *DiBassie*, 2022 WL 16973693, at \*9 (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (discussing factual sufficiency); *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005) (discussing legal sufficiency)).

### Analysis: Issue One, Disproportionate Award to Lori

In issue one, Gary challenges the trial court's property division and argues the trial court erred by awarding Lori a disproportionate share of the community estate where there was insufficient evidence to support such a division. Gary seemingly challenges the trial court's determination that this was a "just and right" division but does not challenge any other specific findings of fact or conclusions of law.

The trial court found that a "30/70 division of the marital estate in favor of Respondent is a just and right division of the marital estate[,]" and that the $365,000.00 money judgment "awarded to Respondent was necessary to reach a just

23

and right division of the marital estate[.]" The trial court's Amended Findings of Fact and Conclusions of Law stated that it considered the *Murff* factors in trying to achieve a "just and right" division of property. *See* Tex. Fam. Code Ann. § 7.001; *Murff*, 615 S.W.2d at 699. Those factors included the parties' earning capacity, the character of the property, Lori's ongoing care of at least one minor child, the fact that Lori set aside her career expectations to care for the children, the difficulty dividing certain assets, and the length of time it would take to sell certain assets, among other things. *See Murff*, 615 S.W.2d at 699; *see also Bradshaw*, 555 S.W.3d at 543.

Here, Gary has not challenged certain underlying findings that support the trial court's disproportionate award to Lori to achieve a "just and right" division of the marital estate. The trial court found that the largest account, Gary's TC Energy Supplemental Pension Plan valued at $841,618, could not be divided greater than a fifty-fifty split under Canadian laws. The court found and awarded Gary the TC Energy account and RBC investment account given certain limitations based on his employment agreement that he maintain shares of a value to equal at least his base annual salary. Specifically, the trial court found that Lori had the primary care for two of their children, one of whom was a minor and another who had serious health conditions. Likewise, the trial court found that Lori spent most of the marriage caring for the children, two of whom had serious medical issues, and Lori put her own

24

career opportunities aside to fulfill that role. Lori was awarded the marital residence, and despite looking for a job, she had not found one. She also testified that she needed liquid assets following the divorce. The trial court also found that their Canadian real property could not be sold quickly due to the renters and the difficulty of evicting those Canadian renters. The trial court found that these facts support the disproportionate share and money judgment awarded to Lori. Finally, the trial court found that Gary's salary, benefits, and employment opportunities "greatly exceed" Lori's. As outlined in our earlier recitation of the parties' testimony and documentary evidence at trial, some evidence of a substantive and probative character supports that this was a "just and right" division of the marital estate. *See Butnaru*, 84 S.W.3d at 211; *DiBassie*, 2022 WL 16973693, at \*9.

Gary complains that the percentage awarded to Lori amounts to seventy percent. "As noted by the concurring opinion in *Bradshaw*, there is no set threshold of percentages allowed or disallowed under either the Texas Family Code or under our jurisprudence." *Bennett*, 2019 WL 1940859, at \*10 (citation omitted). Even so, this Court and other appellate courts have previously affirmed divisions where one spouse received more than seventy percent of the property. *See, e.g.*, *id.* at \*11, 13 (affirming award greater than eighty percent); *Ohendalski*, 203 S.W.3d at 912 (affirming award of eighty-one percent of the community estate to wife); *Wright v.*

25

*Wright*, 65 S.W.3d 715, 716 (Tex. App.—Eastland 2001, no pet.) (affirming award of eighty-eight percent of the community estate to wife).

More than a scintilla of evidence supports the trial court's underlying factual findings, and Gary has failed to establish the contrary as a matter of law or that the trial court's findings were against the great weight and preponderance of the evidence. *See Dow Chem. Co.*, 46 S.W.3d at 241-42; *DiBassie*, 2022 WL 16973693, at *9. We hold the trial court did not abuse its discretion by awarding a disproportionate share to Lori, as evidence of a substantive and probative character supported this as a just and right division of the marital estate. *See* Tex. Fam. Code Ann. § 7.001; *Murff*, 615 S.W.2d at 699; *see also Bradshaw*, 555 S.W.3d at 543; *DiBassie*, 2022 WL 16973693, at *9. We overrule issue one.

**Analysis: Issue Two, Division of Grants**

In his second issue, Gary challenges the trial court's characterization of his "grants" from his employer as community property. He contends the trial court erred by dividing the husband's future grants which he asserts were contingent and discretionary and did not exist at the time of the divorce. In support of this issue, Gary cites *Loya v. Loya*, 526 S.W.3d 448, 451 (Tex. 2017), which involved a mediated settlement agreement. In Loya, the trial court had granted a summary judgment for the husband based on the fact the divorce decree and mediated settlement agreement had specifically contemplated the partition and had awarded

26

the husband a future employment bonus. *Id.* at 450. The court of appeals, citing section 9.201(a), determined that there was "a fact issue concerning the characterization of the bonus." *Loya v. Loya*, 473 S.W.3d 362, 366 (Tex. App.—Houston [14th Dist.] 2015). The Supreme Court reversed and rendered a judgment for the husband agreeing with the trial court because the mediated settlement agreement had contemplated the bonus—and had awarded it to the husband, making a collateral attack impermissible. 526 S.W.3d at 452-53. That said, Loya does not stand for the proposition that all bonuses that may be paid out to a husband in the future should be awarded to the husband. Rather, as stated more recently by the Texas Supreme Court, in the case of *In re J.Y.O.*, 709 S.W.3d 485, 491 (Tex. 2024):

> The characterization of a bonus—like any compensation—depends on when it was earned and that a discretionary bonus paid after divorce for work performed during marriage is community property. The opposite rule would promote gamesmanship by a bonus-earning spouse who can orchestrate deferring the bonus' payment until after divorce.

Gary, as the party asserting the grants were his separate property, bore the burden of rebutting the presumption that the grants are community property, and he had the burden to do so by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 3.003(a); *Pearson*, 332 S.W.3d at 363. Gary failed to meet his burden. The trial court expressly found that the parties had stipulated to the grants being community property and had even provided a value for each year. During pretrial discussions, regarding the grants, Gary's attorney stated that "we're willing to stipulate that any

27

future grants that he gets for work that was done while they were still married would be divided 50/50." Documentary evidence also showed a summary of these grants awarded for work performed during the marriage and their estimated values. Gary's proposed property division admitted into evidence characterized the grants as community property. At no time during trial did Gary assert that these grants constituted his separate property. Additionally, no evidence was admitted that contradicted the community property characterization.

Gary bore the burden of proof to rebut the community property presumption by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 3.003(a); *Pearson*, 332 S.W.3d at 363. Given the admissions made by Gary, as well as the evidence submitted at trial, and the community presumption that applies to the grants, we conclude that the record contains more than a scintilla of evidence supporting the finding that the grants are part of the community estate, and the record does not establish the grants were Gary's separate property as a matter of law. *See Dow Chem Co.*, 46 S.W.3d at 241 (explaining that for "matter of law" challenges where party bears the burden of proof at trial, we first examine the record for evidence supporting the finding, and if there is no evidence supporting the finding, we examine the record to determine if the contrary proposition is established as a matter of law); *Sterner*, 767 S.W.2d at 690 (same). We hold that the evidence supports the trial court's finding characterizing the grants as community property, and Gary failed to establish

as a matter of law that the grants were his separate property, so the trial court did not err by dividing them as part of the community estate. We overrule Gary's second issue.

## CONCLUSION

Having overruled Gary's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on August 25, 2025
Opinion Delivered December 4, 2025

Before Golemon, C.J., Johnson and Wright, JJ.